# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

## No. 95-40818
_____

## UNITED STATES OF AMERICA,

**Plaintiff-Appellee,**

**versus**

## JACK C. HARVARD,

**Defendant-Appellant.**

_____

### Appeal from the United States District Court
### for the Eastern District of Texas
_____

January 7, 1997

Before WISDOM, JONES, and WIENER, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Appellant Jack C. Harvard appeals his convictions for conspiracy, bank fraud, misapplying bank funds, causing false bank entries to be made, and receiving a bribe for a bank transaction. The most difficult question he raises on appeal is whether 18 U.S.C. § 1005, which criminalizes the act of causing false bank entries to be made, embodies a requirement of materiality for an actual misstatement. We hold that it does not and affirm Harvard's conviction on this and the other counts against him.

## I. FACTUAL BACKGROUND

A detailed recitation of the facts as presented at Harvard's trial is necessary for resolution of the issues presented.

## A. Harvard's Many Hats

In 1983, Harvard, then vice-president at Northpark Bank of Dallas ("Northpark"), led a group of investors in borrowing $1,493,000 from Northpark to organize Willow Bend National Bank ("Willow Bend"), a federally insured bank. Harvard served as chairman of the board and chief executive officer at Willow Bend until August 1989. Willow Bend Bancshares, Inc. ("Bancshares"), a bank holding company in which Harvard became chairman of the board, was formed in 1984 to acquire Willow Bend. Bancshares also acquired Bonham State Bank ("Bonham"). Harvard was a director at Bonham from 1984 to 1989. Incidentally, Harvard served as mayor of Plano, Texas during the mid-1980s.

## B. The Cheng/Schapiro Loans

In 1987, Diana Cheng, a Dallas businesswoman, needed $400,000 and a $1,000,000 letter of credit in order to undertake a $2,000,000 Indonesian lumber import deal. A customer and shareholder of Willow Bend, Cheng had been involved in commercial real estate in the Dallas area for several years. Cheng discussed her needs for the Indonesian transaction with Thomas C. Flood, a loan officer at Willow Bend. Flood informed Cheng that Willow Bend could not grant her the loan because she had reached her borrowing limit. Nevertheless, Flood arranged a meeting among Harvard, Cheng, and himself at which Harvard informed Cheng that Willow Bend could lend the money if something was in it for him. By the end of the meeting, Cheng had agreed to give Harvard and Flood, respectively, a 10% and 5% share of the import business. At the meeting, Flood intimated that Cheng should create a real estate note to pledge as collateral for the loan. Cheng did so by creating a $395,600 note payable by her joint venture to the fictitious name of C.D. Donge (the "Donge note"). In connection with these events, Cheng pleaded guilty to conspiring to give money to Harvard and Flood and creating a false document to obtain a loan from Willow Bend. She testified against Harvard.

Harvard then asked Jay Paul Schapiro, an acquaintance through bank-related business and various civic activities, to purchase the Donge note from Willow Bend "to get it off the books."[1] Harvard told Schapiro that the note was secured by undeveloped real estate. When Schapiro stated that he could not pay off the note in the event of default, Harvard assured him that he would find a guarantor, who turned out to be Ms. Cheng. Schapiro purchased the note. Although such notes would usually be purchased at a discount, in this transaction Schapiro borrowed the face value of the note -- $395,000 -- from Willow Bend in return for a $9,000 fee. Apparently unbeknownst to Schapiro, the actual discounted price of the note was $345,000; the remaining balance, less Schapiro's fee, went to Willow Bend. Schapiro never made any payments on the note and was told by Harvard and Flood to ignore late notices and demands for collection. In May of 1987, Flood had the deed of trust for the Donge note recorded in the county real estate records, even though the Donge note was dated December 9, 1985. Cheng gave cash payments of $15,000 to Flood and $10,000 to Harvard. Flood pleaded guilty to bank bribery.

### C. The Joint Venture Loan

In 1985 Harvard had a 10% interest in the Plano-Shiloh Joint Venture (the "Joint Venture"), which purchased and operated a strip mall in Plano, Texas. By March of 1986, the Joint Venture was not self-sustaining and each partner was requested to contribute additional capital. The Joint Venture experienced a loss in excess of $81,986 in 1986, and by 1987 was still losing money. When the Joint Venture decided to refinance with a different lender to reduce interest expenses, Harvard volunteered to assist in having the note refinanced at Bonham where, as stated earlier, he was a director. Harvard solicited John Armstrong, then a bank officer who had risen to chairman of the board by the time of trial, and assured Armstrong that the loan was performing and that the

---

[1]Purchasing a note usually consists of discounting a promissory note to present value or below and then borrowing funds to purchase it. This produces a positive cash flow if the payments on the loan by the purchaser of the note are below the payments on the original note.

shopping center was "cash flowing." Armstrong also asked for and received assurance that an appraisal substantiating the value of the Joint Venture property would be provided.

The Board of Bonham approved the loan. Although Harvard did not vote on the loan, the directors were well aware that Harvard was the chairman of Bancshares, Bonham's holding company. Additionally, on at least one occasion, Harvard reminded Warren Jamieson -- president and chief executive officer of Bonham -- of Harvard's control of Bonham and his ability to replace Jamieson. In extending the loan to the Joint Venture, Bonham required personal guarantees of the individual joint venture participants. On May 29, 1987, the title company forwarded all documents for the loan, including the guarantees, to Nancy Long, Harvard's then-secretary at Willow Bend.[2] Oddly, the guarantee agreements showed the Joint Venture to be indebted to Willow Bend, not Bonham. Harvard was aware of these defects of the guarantees.

After closing on the loan with Bonham, Brenda Brown, a one-percent participant in the Joint Venture and an employee of the Joint Venture's management company, was instructed by her boss at the managing company to write a check in the amount of $10,640 (one percent of the loan amount) payable to Harvard and to call it a "consulting fee." This payment to Harvard was not disclosed on the settlement sheet to Bonham nor was it disclosed by any of the other partners of the Joint Venture

### D. The Unauthorized Cashier's Check

In 1989 Willow Bend's procedure for the issuance of cashier's checks required bank tellers, at the time that cashier's checks were issued, to collect payment of either cash or a cash equivalent. After doing so, a special machine would imprint the appropriate amount on the check along with a machine imprinted signature. Amounts in excess of $5000 required a bank officer's signature; very large amounts required the signature of Willow Bend's vice-president. The details

---

[2]Nancy Long is now Harvard's wife.

regarding the issuance of all cashier's checks -- including the date, check number, remitter, payee, and amount -- were to be entered into a cashier's check log at the time of issuance.

On March 7, 1989, Harvard called Warren Jamieson, who was still president, chief executive officer, and -- at this time -- a director of Bonham, to borrow money from Bonham for the purchase of a house at a foreclosure sale. Harvard represented to Jamieson that he needed only interim financing for the house as he had already obtained a commitment for personal financing from Plano Savings and Loan conditioned on his becoming the successful bidder. Jamieson told Harvard that he did not have the authority to approve another $175,000 debt to Harvard, but he would seek the Board's approval, which was obtained that day. Jamieson informed Harvard, however, that the loan would not be funded until Bonham received the loan documents. The loan documents prepared at Willow Bend were faxed to Bonham the following day, March 8. On that day, Bonham wire transferred $175,000 to Harvard's personal account at Willow Bend.

On March 7, the day before the money was wired (and the same day that Harvard requested the loan from Jamieson), Janice Smith, a teller at Willow Bend, handed Harvard two blank cashier's checks. Ignoring Willow Bend's policy, she did not record in the cashier's check log the details of her parting with these checks. She knew that Harvard was the chief executive officer at Willow Bend, and she did not question him about the checks. She was also unaware that Harvard left the bank with both cashier's checks. Laura Palmer, Smith's supervisor, completed the log after Smith left for the day. Palmer entered "Farm and Home, $166,201" for one of the cashier's checks and initialed the entry; the other cashier's check was voided. Harvard ultimately completed the check by endorsing it and writing in by hand the amount of $166,201 payable to "Farm and Home Savings." This cashier's check was dated March 7, 1989, but the date stamp on the back of the check was March 8. The proof stamp on the face of the check was March 9. Neither Palmer nor Smith ever received any cash payment for either cashier's check. The cashier's check for $166,201 was used to purchase a house at a foreclosure sale on March 7. Willow Bend did not receive funds to pay for the

5

check until June 11, 1989. As a result, Willow Bend suffered a cash loss of $117.73 in interest income it would have received from the $166,201.

### E. Indictment and Convictions

After a trial to a jury, Harvard was convicted pursuant to the indictment of:

Count One -- violating 18 U.S.C. § 371 by conspiring to (a) misapply monies belonging to Willow Bend, (b) make and cause to be made false entries in the books of Willow Bend, and (c) corruptly accept something of value in connection with the business of Willow Bend;

Count Two -- violating 18 U.S.C. § 215 by corruptly accepting something of value in connection with the business of Willow Bend;

Count Three -- violating 18 U.S.C. § 656 by misapplying monies belonging to Willow Bend;

Count Four -- violating 18 U.S.C. § 1005 by making a false entry on the books of Willow Bend in connection with the Cheng/Schapiro loans;

Count Five -- violating 18 U.S.C. §§ 1344 and 2 by committing and aiding and abetting in the commission of bank fraud; and

Count Fourteen -- violating 18 U.S.C. §§ 1005 and 2 by misapplying monies and aiding and abetting in the misapplication of monies belonging to Willow Bend.

Harvard complains on appeal that (1) the district court erred in instructing the jury that 18 U.S.C. § 1005 does not require a finding by the jury of materiality regarding the false entries; (2) there was insufficient evidence to convict on two of the offenses; and (3) the government's references at trial to Harvard's violations of civil banking regulations deprived him of a fair trial under counts 5 and 14 of the indictment.

## II. DISCUSSION

### A. 18 U.S.C. § 1005

18 U.S.C. § 1005 provides, in relevant part:

Whoever makes any false entry in any book, report, or statement of [a] bank . . . with intent to injure or defraud such bank . . . or to deceive any officer of such bank . . . [s]hall be fined . . . or imprisoned . . . or both.

18 U.S.C. § 1005 (West Supp. 1996).

In regard to this § 1005 offense charged against Harvard, the court instructed the jury, in relevant part:

6

> An entry may be false if it omits material information. An entry may also be false when it contains a half truth or when it conceals a material fact, and a statement that is technically true may be false if the transaction it reports is a sham or mere formality. An omission of material information as well as affirmative representations also constitutes a false statement.
>
> You are instructed that these entries are material within the meaning of the statute, and you are not to concern yourselves with the issue of materiality.

R19:1993. Harvard asserts that because of the Supreme Court's recent decision in *United States v. Gaudin,* ___ U.S. ___, 115 S.Ct. 2310 (1995), this instruction was in error because it did not require the jury to make a finding of materiality. We review a court's refusal to include a requested instruction in the charge for an abuse of discretion. *See United States v. Pettigrew,* 77 F.3d 1500, 1510 (5th Cir. 1996) (citing *United States v. Storm,* 36 F.3d 1289, 1294 (5th Cir. 1994), *cert. denied,* ___ U.S. ___, 115 S.Ct. 1798 (1995)). "Generally, refusal to include a requested instruction is reversible error only if the requested instruction is substantially correct, the actual charge given the jury did not substantially cover the content of the proposed instruction, and the omission of the proposed instruction would seriously impair the defendant's ability to present a defense." *Id.*

In *Gaudin*, the Court held that, where materiality of a false statement *is an element of the offense charged*, the defendant has the right to have the jury decide the issue of materiality. *See Gaudin,* 115 S.Ct. at 2314. On that basis, the Court affirmed reversal of Gaudin's conviction under 18 U.S.C. § 1001.[3] *See id.* In *United States v. Pettigrew, supra,* we relied on *Gaudin* in ruling

---

[3]18 U.S.C. § 1001 provides, in relevant part:

> Whoever . . . knowingly and wilfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined . . . or imprisoned . . . or both.

*Gaudin,* 115 S.Ct. at 2313.

7

that a jury must make a finding of materiality in order to establish a violation of 18 U.S.C. § 1006.[4]
*See Pettigrew,* 77 F.3d at 1511.

Significantly, neither in *Gaudin* nor in *Pettigrew* did the government contest materiality as an essential element of the offenses proscribed by §§ 1001 or 1006.[5] In this case it is different; the parties vigorously dispute whether materiality is a required element of an offense proscribed by § 1005.[6] Perhaps somewhat at odds with its jury instruction, the district court found that "[m]ateriality is not an essential element in order to establish a violation of [§ 1005]." Therefore, unlike the procedural posture of *Gaudin* and *Pettigrew,* this case poses the issue whether materiality is an essential element of the offense before we can consider the applicability of *Gaudin*. Based on due respect for the statutory text, pertinent case law, and related legislation, we conclude that materiality is not an element of a § 1005 offense charging an actual misstatement.

---

[4] 18 U.S.C. § 1006 provides, in relevant part:

> Whoever . . . with intent to defraud any such institution or any other company, body politic or corporate, or any individual, or to deceive any officer, auditor, examiner or agent of any such institution . . . makes any false entry in any book, report or statement of or to any such institution . . . shall be fined . . . or imprisoned . . . or both.

18 U.S.C. § 1006 (West Supp. 1996)

[5] "It is *uncontested* that conviction under [18 U.S.C. § 1001] requires that the statements be 'material' to the Government inquiry, and that 'materiality' is an element of the offense that the Government must prove." *Gaudin*, 115 S.Ct. at 2313 (emphasis added). Some members of the Court commented further that "the Government's concessions [that materiality is an element of § 1001] have made this case a much easier one than it might otherwise have been. . . . [¶]Whether 'materiality' is indeed an element of every offense under 18 U.S.C. § 1001 is not at all obvious from its text." *Id.* at 2320 (Rehnquist, J., concurring, joined by Justices O'Connor and Breyer).
  Likewise, in *Pettigrew*, the government conceded that materiality was an essential element of an offense proscribed by § 1006. *See Pettigrew*, 77 F.3d at 1510.

[6] The government has become more assertive in contesting implied materiality requirements in federal criminal statutes. It recently applied for and received a grant of certiorari allowing the Supreme Court to consider whether a judicially engrafted materiality element exists in crimes defined by 18 U.S.C. § 1014. *See United States v. Wells*, 63 F.3d 745, 750-51 (8th Cir. 1995), *cert. granted*, 116 S.Ct. 1540 (1996).

First, as quoted earlier, § 1005 makes no reference to the required materiality of a criminal false bank entry.

Second, we have found no Fifth Circuit case that imported a materiality requirement into § 1005. Instead, this court has previously stated:

> The government establishes a violation of section 1005 by proving beyond a reasonable doubt that: (1) the entry is false; (2) the defendant either personally made the entry or caused it to be made; (3) the defendant knew the entry was false when he made it; and (4) the defendant intended that the entry injure or deceive the bank officers or public officers. . . . *An omission of material information as well as an actual misstatement qualifies as a false entry under the statute.*

*United States v. Jackson,* 621 F.2d 216, 219 (5th Cir. 1980) (emphasis added). *See also United States v. Wolf,* 820 F.2d 1499, 1504 (9th Cir. 1987) (setting forth the elements of a violation of § 1005 as not requiring a finding of materiality), *cert. denied,* 485 U.S. 960 (1988). *Jackson* holds that the government establishes a violation of § 1005 if it proves, *inter alia,* that the defendant made either (1) an actual misstatement or (2) a *material omission* of information. *See id.* Proof of an actual misstatement does not require proof of its materiality. The government is only required to prove materiality after *Jackson* when it seeks to convict a defendant pursuant to § 1005 for an *omission* of information. As Harvard was indicted and convicted under § 1005 for an actual misstatement of information, no finding of materiality was required.[7]

Third, § 1005 does not require that the courts add an element of materiality because materiality is inherent in the statute. To convict an offender pursuant to § 1005, the jury must find that the false entry at issue was made *with intent to defraud or injure. See* 18 U.S.C. § 1005; *Jackson,* 621 F.2d at 219. It is highly unlikely that the government could show -- or a jury would find -- that a genuinely trivial entry was made with fraudulent or injurious intent. To rule otherwise and require the government to prove materiality would reward only that individual who intended to defraud or injure a bank, but did so by making a "non-material" misstatement. Based on the text of

---

[7]This opinion does not consider whether *Jackson* might incorrectly require materiality in a case involving a fraudulent omission. The issue is not before us, and we are bound by the prior panel decision.

9

the statute, a more reasonable interpretation of § 1005 is that Congress intended that punishment follow culpability regardless of the "materiality" of the means chosen to effectuate the fraud or injury.

We must respect the fact that the legislature is entrusted with the responsibility of defining the elements of a criminal offense -- particularly in the case of federal crimes, which are solely creatures of statute. *See Staples v. United States*, 511 U.S. 600, ___, 114 S.Ct. 1793, 1796-97 (1994). According to the plain language of § 1005, Congress manifested the intent to punish *any* false entry made with intent to defraud. Had Congress intended to reserve punishment for only those individuals who made *material* fraudulent entries, it could easily have done so. Indeed, Congress has expressly included a materiality requirement in other false statement statutes. *See, e.g.,* 18 U.S.C. § 1621 (perjury); 18 U.S.C. § 1623 (false declaration before grand jury or court); 18 U.S.C. § 922(a)(6) (false statement on firearms application); 18 U.S.C. § 1033 (false statement on insurance application). The absence of a materiality requirement in § 1005 thus seems deliberate.

In a related vein, this court recently decided *United States v. Upton*, 91 F.3d 677 (5th Cir. 1996), *petition for cert. filed,* 65 U.S.L.W. 3310 (U.S. Oct. 8, 1996) (No. 96-560), in which we addressed whether materiality is an element of 18 U.S.C. § 287.[8] By its text, § 287, like § 1005, does not expressly require the false entry be material. This court reasoned:

> In making our own determination of whether materiality is an element of § 287, we look to the plain language of the statute. . . . The plain language of this provision in no way suggests that materiality is an element of the offense. "When we find the terms of the statute unambiguous, judicial inquiry is complete except in rare and exceptional circumstances." The plain language of a statute must be followed unless the language is "so bizarre that Congress could not have intended it." We therefore . . . hold that materiality is not an element of 18 U.S.C. § 287.

---

[8] 18 U.S.C. § 287 provides, in relevant part:

Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States . . . any claim upon or against the United States . . . knowing such claim to be false, fictitious, or fraudulent, shall be imprisoned . . . and shall be subject to a fine . . ..

18 U.S.C. § 287 (West Supp. 1996).

10

*Upton,* 91 F.3d at 685 (quoting *Demarest v. Manspeaker,* 498 U.S. 184, 190-91, 111 S.Ct. 599, 604 (1991)) (citations omitted).

As Harvard points out, two other circuits appear to have decided, without debate, that conviction for an actual misstatement under § 1005 requires proof of materiality. *See United States v. Rapp*, 871 F.2d 957, 963 (11th Cir.), *cert. denied,* 493 U.S. 890 (1989); *United States v. McGuire*, 744 F.2d 1197, 1202 (6th Cir. 1984), *cert. denied,* 471 U.S. 1004 (1985). Other courts appear to require proof of materiality for false omissions, and it is uncertain whether their materiality requirement has been extended further. *See, e.g., United States v. Austin*, 823 F.2d 257, 259 (8th Cir. 1987), *cert. denied,* 484 U.S. 1044 (1988); *United States v. Krepps*, 605 F.2d 101, 109 (3rd Cir. 1979). Bolstered by *Jackson*, *supra*, however, and by the foregoing analysis, we are confident that materiality is not an element of § 1005 when the government seeks, as here, to convict a defendant for an actual misstatement.[9]

## B.  Count 5

Harvard next complains that his convictions under Count 5 of the indictment should be reversed. Harvard claims that (1) he was forced to defend himself at trial while unaware of the charges against him and (2) there is insufficient evidence to uphold this conviction.

Count 5 of the indictment charges Harvard with violations of 18 U.S.C. § 1344 (1) and (2)[10] in connection with the Joint Venture:

---

[9]Because we hold that the district court did not err in removing the issue of materiality from the jury's consideration, it is not necessary to consider Harvard's complaints regarding his conviction for conspiracy stemming from his § 1005 violation or the substantive offenses pleaded under the conspiracy mantle.

[10]18 U.S.C. § 1344 provides, in relevant part:

Whoever knowingly executes, or attempts to execute, a scheme or artifice --

> (1)      to defraud a financial institution; or

> (2)      to obtain any of the moneys, funds, credits, assets, securities, or other property . . . of a financial institution, by means of false or fraudulent pretenses,

<u>The Scheme and Artifice</u>

. . . It was part of the scheme and artifice to defraud and to obtain money, funds and credits from Bonham Bank, that HARVARD . . . would arrange for financing to [the Joint Venture] at Bonham Bank by misrepresenting the financial status of [the Joint Venture] and his personal interest in a one percent "consulting fee" for the finding of the loan.

<u>Execution of the Scheme and Artifice to Defraud and Obtain Money:</u>

. . . HARVARD . . . executed the scheme and artifice set forth above, in that (1) he misrepresented financial information concerning [the Joint Venture] to Bonham Bank, (2) received a payment of $10,640.00 from [the Joint Venture] and (3) arranged for financing to [the Joint Venture] at Bonham Bank by misrepresenting the financial status of [the Joint Venture] and his personal interest in a one percent "consulting fee" for the finding of the loan.

R1:28-29.

## 1. Multiple Charges

Section 1344 prohibits two types of conduct: (1) a scheme to defraud and (2) a scheme to obtain monies by false representation. *See* 18 U.S.C. § 1344 (West Supp. 1996). Count 5 of Harvard's indictment alleges violations of *both* types of proscribed conduct. It is this about which Harvard complains. He claims that because a single count of the indictment identified two crimes, he was forced to defend himself at trial while uninformed of the precise charges against him. Harvard's argument is without merit.

"Where a statute specifies several alternative ways in which an offense can be committed, the indictment may allege the several ways in the conjunctive, and a conviction thereon will stand if proof of one or more of the means of commission is sufficient." *Fields v. United States,* 408 F.2d 885, 887 (5th Cir. 1969) (footnote omitted); *see also United States v. Wiley,* 979 F.2d 365, 368 (5th Cir. 1992). In Harvard's case, the government elected before the jury was charged -- as is its option -- to proceed under § 1344(1). The district court did not err in permitting the government

representations, or promises . . . shall be fined . . . or imprisoned . . . or both.

18 U.S.C. § 1344 (West Supp. 1996).

12

to do so. The record shows that Harvard was fully prepared to and did defend against the charge that he engaged in a scheme to injure or defraud the bank on the Joint Venture loan.

## 2. Sufficiency of the Evidence

Harvard also argues that the evidence was insufficient to support his conviction under § 1344(1). In reviewing a conviction for sufficient evidence, this court determines whether any reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt. *See United States v. Blackburn,* 9 F.3d 353, 356 (5th Cir. 1993) (citing *United States v. Hernandez-Palacios,* 838 F.2d 1346, 1348 (5th Cir. 1988)), *cert. denied,* ___ U.S. ___, 115 S.Ct. 102 (1994). We view the evidence in the light most favorable to the government and give the government the benefit of all reasonable inferences and credibility choices. *See id.* To establish a violation of § 1344(1), the government was required to prove (1) that Harvard executed or attempted to execute a scheme or artifice to defraud Bonham; (2) that Bonham was a federally insured institution; and (3) that he acted knowingly. *See id.* The phrase "scheme or artifice to defraud" may be established by proving a scheme or artifice to defraud another of the intangible right of honest services. *See United States v. Hooten,* 933 F.2d 293, 296 (5th Cir. 1991).

The government presented expert testimony supporting its position that, under applicable law, bank directors are required to disclose their personal interests in the bank's business. The evidence established that Harvard, while a director of Bonham, arranged to receive a 1% "consulting fee" -- $10,640 paid out of the loan proceeds -- for placing the Joint Venture loan. Harvard did not disclose his receipt of the money. Evidence was also presented establishing that although he did not personally vote on the loan, Harvard exerted influence over the Board members' votes in other ways by, for example, reminding Warren Jamieson of Harvard's ability to replace him.

Both Armstrong and Jamieson testified that Bonham would not have made the Joint Venture loan if the Board had been aware of the Joint Venture's true financial condition. Armstrong and Jamieson also testified that Bonham relied on Harvard's untrue representations that the shopping

13

center was "cash flowing" and 100% leased. The testimony at trial indicated that based on these representations, Bonham funded the loan prior to receiving the appraisal and that the appraisal did not support Harvard's representations.

Armstrong and Jamieson denied that Bonham would have funded the Joint Venture loan if the Board had been aware that the personal guarantee agreements signed by participants of the Joint Venture showed the Joint Venture was indebted to Willow Bend instead of Bonham as they should have been. The defective guarantees were prepared at Willow Bend, Harvard's bank, and the loan documents were processed by Harvard's secretary. Testimony elicited at trial indicated that Harvard knew of the defects in the guarantee agreements at the time of closing. The testimony also established that when Jamieson discovered the guarantees' defects in 1989, Harvard agreed that the Joint Venturers would execute new guarantees to Bonham if the Joint Venture could skip a payment on its loan. The jury could have concluded that Harvard knew the guarantees were defective but withheld this information from Bonham. As a result, it could have accepted the government's position that these events constituted a scheme or artifice to defraud Bonham of its interest in the guarantees as security.

In sum, the evidence presented at trial concerning Harvard's acquisition of the "consulting fee" for his assistance in obtaining the loan for the Joint Venture and his taking advantage of faulty guarantees in association with that loan were sufficient to support a conviction pursuant to § 1344(1). A reasonable trier of fact could find beyond a reasonable doubt that Harvard knowingly executed a scheme or artifice to defraud Bonham Bank.

### C. Count 14

Count 14 of the indictment alleges in relevant part:

On or about March 7, 1989 . . . HARVARD, without authority from the directors of Willow Bend, with intent to defraud or injure Willow Bend knowingly made, drew, issued, put forth, or assigned a draft, or other obligation of Willow Bend . . . in the amount of $166,201.00 . . . for the purchase at foreclosure auction of a house and real estate with Willow Bend's funds, when he then knew that he did not have sufficient funds to pay for said cashier's check and that Willow Bend had not approved a loan to him in the amount of said check.

14

R1:43.

These acts constitute a violation of the second paragraph of 18 U.S.C. § 1005, whose elements are that (1) the bank is federally insured; (2) that Harvard made, drew, or issued a draft or obligation of the bank without authority of its directors; and (3) Harvard intended to injure or defraud the bank.

Harvard again argues that there is insufficient evidence to support the jury's finding that he had intended to defraud or injure Willow Bend. His argument is that because he had arranged permanent financing for the house through Plano Savings and Loan and interim financing through Bonham prior to taking the cashier's checks from Willow Bend, Willow Bend was certain to get the $166,201 to cover the cashier's check and no intent to defraud or injure can be inferred from this evidence. We disagree.

Intent to injure or defraud may be proved "'by showing a knowing, voluntary act by the defendant, the natural tendency of which may have been to injure the bank even though such may not have been his motive.'" *United States v. Hopkins,* 916 F.2d 207, 215 (5th Cir. 1990) (quoting *United States v. Southers,* 583 F.2d 1302, 1305 (5th Cir. 1978)). Harvard's unauthorized use of the cashier's checks resulted in a formal inquiry by the Office of the Comptroller of Currency. On March 7, 1989 Harvard, possessing the blank cashier's checks from Willow Bend, could have easily executed these checks for any amount and for any purpose. If he had chosen to do so, Willow Bend would have been obliged to pay because once issued, cashier's checks are certified funds and Willow Bend must pay on the instruments.

Harvard's disregard of Willow Bend's procedures placed the bank at risk and naturally tended to injure the bank. As a result of these events, and other evidence in the record, Willow Bend incurred an actual loss of $117.28 due to this transaction. This evidence was sufficient for a reasonable fact finder to conclude that Harvard violated the second paragraph of § 1005.

15

## D. Civil Banking Regulations

Harvard finally argues that the district court abused its discretion in permitting evidence of and various references to civil banking regulations throughout his trial. We disagree.

We review the district court's evidentiary rulings for an abuse of discretion. *See United States v. Parks,* 68 F.3d 860, 867 (5th Cir. 1995), *cert. denied,* ___ U.S. ___, 116 S.Ct. 825 (1996). Evidence of civil banking regulations is admissible for the limited purpose of showing the defendant's motive or intent. *See id. at* 866-67 (citing *United States v. Cordell,* 912 F.2d 769, 774-76 (5th Cir. 1990)). At Harvard's trial, evidence of banking regulations tended to prove that Harvard had a motive to make false entries in order to hide the nature of the sham loan to Schapiro. Evidence that Harvard's non-disclosure of the "consulting fee" was in violation of civil banking regulations went toward showing Harvard's knowledge of his duty to disclose the fee and his motivation to hide his receipt of the fee.

The district court frequently instructed the jury regarding the regulatory evidence and guided its consideration of such evidence during the testimony of each government witness and at the end of the trial. For example, at the end of the trial, the district court instructed the jury, in relevant part:

> You are cautioned . . . that you may not find the Defendant guilty of any crime solely because he may have violated such an administrative banking regulation or because he may have violated internal bank policies. However, you may, but are not required to consider evidence of violations of administrative banking regulations as you would any other evidence in determining whether the Defendant had the required intent to commit the crime charged in the indictment.

R19:2000-01.

It is clear that the district court was mindful of the potentially prejudicial nature of the regulation evidence and the possibility that it might be confused with violations of federal criminal law. It is also clear from the record that the district court took appropriate measures to ensure that the jury did not improperly use the evidence in determining Harvard's guilt or innocence. We conclude that the district court employed the necessary measures to prevent prejudice and confusion

16

and, in doing so, neither abused its discretion nor prejudiced Harvard's case by permitting evidence of banking regulations for limited purposes.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.