**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 95-30154

_____

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

VERSUS

JOHN A. MMAHAT and JOSEPH C. MMAHAT, JR.,

                              Defendants-Appellants.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana

_____

February 7, 1997

Before HIGGINBOTHAM, SMITH, and BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


John Mmahat and Joseph Mmahat, Jr., have brought appeals from their convictions for misapplying bank funds, making false entries in bank records, making false statements to influence a federal agency, and conspiracy to commit each of the same. We affirm John Mmahat's conviction and affirm in part and vacate in part Joseph Mmahat's conviction.


I.

John and Joseph Mmahat, who are brothers, were chairman and president, respectively, of Gulf Federal Savings Bank ("Gulf"), a federally insured financial institution in Metairie, Louisiana. In April 1983, an audit by the Federal Home Loan Bank Board ("FHLBB") showed that Gulf was essentially insolvent and that some of its commercial loans were unlikely to be paid back. The FHLBB commenced a follow-up audit of Gulf in November 1984.

The audit placed the Mmahats in a precarious position. If Gulf were to close, they would lose their considerable investments in the thrift; John Mmahat additionally would lose the substantial stream of income his law firm received from work associated with Gulf's loan closings, and Joseph Mmahat his six-figure salary. The Mmahats thus undertook to have Gulf make sham loans to shell corporations and loan swaps with other banks so as to conceal its weak financial position.

The effect of these transactions was temporarily to decrease Gulf's delinquent loan balance and inflate its income on its 1984 financial statement. Ultimately, however, the scheme failed, and Gulf went into receivership in November 1986.

The first of the sham loans stemmed from a transaction involving CPA Associates ("CPA"), an investment partnership that previously had acquired a set of town homes in Gretna, Louisiana, known as Cypress Park, with the intention of converting them into condominiums. Gulf had financed this original purchase with a $2,069,000 loan. By late 1984, however, CPA was seriously

2

delinquent on this original loan, and Gulf was considering foreclosure. Instead of having Gulf foreclose, the Mmahats arranged for Cypress Park to be purchased by K & K Financial Services ("K & K"), a company owned by codefendant William Mulderig. Thus on December 28, 1994, K & K bought Cypress Park from CPA Associates for $2,069,000, and Gulf loaned K & K slightly more than that amount.

The second loan was similar. In the early 1980's, Gulf had financed the purchase by Ronald Frank of an apartment complex called Nel Place. A downturn in the real estate market made Frank unable to meet his monthly loan payments, and Gulf determined that the value of the apartments did not support the loans. Rather than foreclose, however, Gulf persuaded Mulderig to purchase Nel Place and replaced the failing loan with one to Dermul Management ("Dermul"), one of his companies. On December 28, 1984, Frank sold Nel Place to Dermul for $1,632,730, and Gulf loaned Dermul that amount plus a substantial amount of excess cash, secured by a deed of trust for property Mulderig owned in Goshen, New York.

The gravamen of most of the charges against the Mmahats is that the K & K and Dermul loans were closed in haste in order to deceive FHLBB regulators and that Gulf's lending policies and procedures were violated. Specifically, the K & K loan was never authorized by Gulf's loan committee; no mortgage was ever obtained on the property in Goshen that was to secure the excess on the Dermul Management loan; the documentation on the Dermul management

3

loan was substantially incomplete at the time it was executed; and nobody involved in the Dermul or K & K loans had individual authority to make them.

Further to bolster Gulf's apparent financial position, John Mmahat also orchestrated an exchange of questionable loans with First Progressive Bank ("First Progressive"). On December 20, 1984, Gulf's loan committee considered six prospective loan participations with First Progressive and approved only one, a $200,000 loan to Philip Capitano. On December 28, 1984, John Mmahat asked two of Gulf's employees to deliver documents relating to the Cypress Park loan to First Progressive. One of the employees, David Lichtenstein, returned to Gulf with participation certificates not only for the loan that had been approved but also for one of the ones that had not, a $250,000 participation to Jack Parker.

John Mmahat hastily closed the Parker participation himself and warned Lichtenstein to keep the exchange a secret. On January 3, 1985, Lichtenstein resubmitted the Parker and Capitano participations to Gulf's loan committee under more favorable terms than those of the original proposal. The committee, despite the fact that the participations had already been funded and the loans closed, approved the two transactions. None of the Gulf personnel involved in these transactions had individual authority to make the loans.

The sham transactions thus having been completed, it remained

only for the individuals involved to cover them up. In 1985, Lichtenstein and Michael Farley, one of Gulf's consumer loan officers, approached David Resha, a member of Gulf's loan committee who had not been present at the December 27, 1984, meeting. Lichtenstein and Farley induced Resha to sign a backdated and incomplete approval for the Dermul loan, which had already closed. The approval sheet was also signed by both of the Mmahats.

## II.

The result of this series of events was a lengthy indictment charging both Mmahats with conspiracy to misapply bank funds (18 U.S.C. § 657), to make false entries in bank records (18 U.S.C. § 1006), and to make false statements to influence a federal agency (18 U.S.C. § 1008) (collectively, count one); substantive misapplication of bank funds (18 U.S.C. § 657) (counts three and five); and substantive making of false entries in bank records (18 U.S.C. § 1006) (count four). John Mmahat was also charged with five additional counts of misapplication of bank funds (counts six through ten).

The defendants were convicted of all the above offenses; John Mmahat was sentenced to 21 years' imprisonment and ordered to pay $2,032,000 in restitution; Joseph Mmahat was sentenced to 29 months' imprisonment and ordered to pay $46,000 in restitution. During the pendency of this appeal, Joseph Mmahat died. His counsel subsequently moved to vacate Joseph's indictment, convic-

tion, and sentence, or in the alternative to pursue his appeal on behalf of his heirs. Because the death potentially moots some of the substantive arguments before the court, we first consider its effect on the appeal.

III.

Normally, the death of a criminal defendant during the pendency of his appeal abates the entire proceeding *ab initio*. *United States v. Asset*, 990 F.2d 208, 210 (5th Cir. 1993); *United States v. Schuster*, 778 F.2d 1132, 1133 (5th Cir. 1985); *United States v. Pauline*, 625 F.2d 684, 684-85 (5th Cir. 1980). In *Asset*, however, we held that a conviction that results in a sentence of restitution presents a special circumstance, for the abatement principle is premised on the fact that criminal proceedings are penal. *Asset*, 990 F.2d at 211. After thoroughly analyzing the issue, we concluded that restitution has "both compensatory and penal aspects" and that the nature of any specific restitution order depends "on the purpose for which the obligation is imposed." *Id.* at 213.

When restitution is ordered simply to punish the defendant, it is penal and abates with the rest of his conviction. When it is designed to make his victims whole, however, it is compensatory and survives his death. *Id.* at 213-14. In such a case, only the

6

portion of the proceedings unrelated to the restitution order is abated. *See, e.g., United States v. Dudley*, 739 F.2d 175, 179 (4th Cir. 1984).

We conclude that the purpose of the restitution ordered against Joseph Mmahat was to compensate the entities that he damaged. The payments ordered were $45,000 to the Federal Savings and Loan Insurance Corporation ("FSLIC") and $1,000 to Ronald Frank. Although the district court did not make any specific findings as to the losses Joseph Mmahat caused to the FSLIC and Frank, we think it self-evident, in light of the nature of his crimes, that these entities sustained losses and that the purpose of the restitution was to compensate them.

This in turn means that only the portion of Joseph Mmahat's criminal proceeding wholly unrelated to the restitution order may be abated. Because the restitution order survives, however, we grant the motion for his heirs to continue the appeal in his stead. Furthermore, as Joseph Mmahat's substantive arguments potentially could result in a reversal of his conviction and sentence, we give them full consideration hereinbelow.

IV.

The Mmahats contend that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing specifically to point the defense to a pair of allegedly exculpatory bank board resolutions.

7

In order to establish a *Brady* violation, the Mmahats must show that the information allegedly withheld from them was not available through due diligence. *United States v. Aubin*, 87 F.3d 141, 148-49 (5th Cir. 1996), *petition for cert. filed*, 65 U.S.L.W. 3507 (U.S. Jan. 2, 1997) (No. 96-1081); *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980).

The facts surrounding this claim are unfortunate. Some months before trial, the government gave the defense access to a 500,000-page cache of documents relating to the case, the most important portions of which were indexed. The Mmahats' theory of the case was that they actually had had the authority to make the Cypress Park and Nel Place loans, and they searched the cache for evidence in support of this. It was not until after the trial was over, however, that counsel for one of their codefendants found what they were looking forSSa pair of board resolutions that ostensibly gave the Mmahats general authority to negotiate and approve loans on whatever terms they saw fit. The Mmahats claim that the government should have alerted them specifically to these resolutions in response to their *Brady* requests.

At a subsequent post-trial motion hearing, the government conceded that it had been aware of these resolutions but argued that it had met its *Brady* obligation by disclosing them in the 500,000-page cache. The district court eventually found that, although the resolutions were material and might have affected the

jury's verdict had they been introduced at trial, the defendants' lack of due diligence foreclosed the possibility of relief. We agree.

The Mmahats do not dispute that they had both personal knowledge of the resolutions and access to them before trial. Due diligence in failing to locate exculpatory material is a necessary element of a successful *Brady* claim, *Aubin*, 87 F.3d at 148-49, and we cannot see how the Mmahats meet this standard. As the district court correctly noted, there is no authority for the proposition that the government's *Brady* obligations require it to point the defense to specific documents within a larger mass of material that it has already turned over.

V.

The Mmahats also contend that they were unfairly prejudiced by the government's nine-year delay in bringing an indictment. This circuit's test for prejudicial pre-indictment delay was recently clarified in *United States v. Crouch*, 84 F.3d 1497 (5th Cir. 1996) (en banc), *cert. denied*, 117 S. Ct. 736, *and cert. denied*, 117 S. Ct. 736 (1997). In *Crouch*, we held that pre-indictment delay entitles the accused to a dismissal only when he shows (1) that the delay "was intentionally brought about by the government for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other bad faith

9

purpose" and (2) that the delay "caused actual, substantial prejudice to his defense."  *Crouch*, 84 F.3d at 1523.

Prior to trial, John Mmahat moved that the indictment be dismissed for excessive delay, arguing that he was prejudiced by the faded memories and unavailability of potential witnesses, changed perceptions of the culpability of his conduct, and the intervening conviction of one of the other individuals involved in arranging the loans.  The district court denied his motion on the ground that he had not established actual prejudice.

That ruling was correct.  By "actual, substantial prejudice," the *Crouch* court meant to exclude just this sort of claim.  Indeed, as a panel of this court held two years before *Crouch* was decided, "[v]ague assertions of lost witnesses, faded memories, or misplaced documents are insufficient."  *United States v. Beszborn*, 21 F.3d 62, 67 (5th Cir.), *cert. denied*, 115 S. Ct. 330 (1994).

The Mmahats also specifically claim that they have been prejudiced in their inability to present testimony from Mulderig's accountant, who died before trial.  This argument is largely belied by the fact that the earlier civil suits against them required the Mmahats to assemble essentially the same documents and witnesses as did the criminal prosecution.  Moreover, they have not even attempted to show the bad faith delay required under *Crouch*.

VI.

10

The Mmahats next challenge three aspects of the jury instructions, which we address seriatim.

A.

The Mmahats assert that the district court improperly prevented the jury from considering the materiality of the statements charged in counts one and four, conspiracy to make a false entry in bank records in violation of 18 U.S.C. § 371 (count one), and the substantive charge of having done the same in violation of 18 U.S.C. § 1006 (count four). At trial, the Mmahats requested an instruction that paralleled this circuit's pattern jury instruction on 18 U.S.C. § 1005, the bank fraud statute. Without objection from the defense, the court instructed the jury:

> For you to find the Defendants guilty of this crime, you must be convinced that the Government has proved each of the following elements beyond a reasonable doubt:
>
> First, that the Defendants were officers, agents, or employees of, or connected in any capacity with, Gulf Federal Savings Bank, or that they were aiders or abettors of such people[;]
>
> Second, that the accounts of Gulf Federal Savings Bank were insured by the Federal Savings and Loan Insurance Corporation;
>
> Third, that the Defendants had the intent to deceive the examiners of Gulf Federal or any department or agency of the United States;
>
> Fourth, that, with this intent, the Defendants made or caused to be made false entries in any book, report, or statement of or to Gulf Federal Savings Bank.

The government incorrectly argues that 18 U.S.C. § 1006's lack

of an explicit materiality requirement means that the omission of materiality from the jury instructions was not error at all.  As we held in *United States v. Pettigrew*, 77 F.3d 1500, 1510-11 (5th Cir. 1996), "materiality is an essential element of the [§ 1006] false entry offense."  Although other cases support this proposition as well, we need look no further, for *Pettigrew* is binding precedent.[1]

It follows that materiality is an element of conspiracy to violate § 1006, for a conspiracy to make an *immaterial* false entry in bank records would lack an unlawful object.[2]  Because the Mmahats did not object to these instructions at the time of trial, we review for plain error.  FED. R. CRIM. P. 52(b).  In order for us to reverse under this analysis, we must find that there was (1) an error; (2) plainness; (3) a prejudicial effect on substantial rights; and (4) a compromise of the fairness, integrity, or public reputation of judicial proceedings.  *United States v. Olano*, 113 S. Ct. 1770, 1776-79 (1993); *United States v. Calverley*, 37 F.3d 160, 162 (5th Cir. 1994) (en banc), *cert. denied*, 115 S. Ct. 1266 (1995).  Thus even when an error meets the first three criteria of the plain error analysis, we still may exercise our

---

[1] *Cf. United States v. Harvard*, 103 F.3d 412, ___ (5th Cir. 1997) (distinguishing *Pettigrew* and holding that materiality is not an essential element under a related bank fraud statute, 18 U.S.C. § 1005).

[2] *Cf. United States v. Feola*, 420 U.S. 671, 686 (1975) ("Our decisions establish that in order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself.") (citations omitted); *Ingram v. United States*, 360 U.S. 672, 678 (1959) (same); *United States v. Buford*, 889 F.2d 1406, 1409 n.5 (5th Cir. 1989) (same).

12

discretion not to reverse if the error does not "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Calverley*, 37 F.3d at 162 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

The first and second prongs of the *Olano* testSSthe existence of a plain errorSShinge in this case on whether plain error is measured at the time of trial or at the time of appeal. Notwithstanding the fact that a recent en banc decision of this court addressed the issue, *see Calverley*, 37 F.3d at 162-63, subsequent panel decisions have left our caselaw, at best, confused.[3] Fortunately, the discretionary prong of plain error analysis allows us to avoid both this conflict and the still thornier question of whether failure to instruct the jury on an element of the offense inevitably prejudices substantial rights.[4]

At trial, the Mmahats never suggested, much less argued, that their false entries were immaterial. It would have been virtually pointless to do so, for the fact that they were made to convince

---

[3] *Compare Calverley*, 37 F.3d at 162-63 (mandating that plain error be "'clear under current law' at time of trial") (quoting *Olano*, 507 U.S. at 734) *with United States v. Jobe*, 101 F.3d 1046, 1062 (5th Cir. 1996) (stating that plain error may be measured at time of appeal).

[4] *Compare United States v. Allen*, 76 F.3d 1348, 1368 (5th Cir.) (assuming that failure to instruct on an element is structural error), *cert. denied*, 117 S. Ct. 121 (1996); *United States v. Garza*, 42 F.3d 251, 253 (5th Cir. 1994) (holding that failure to instruct on an essential element is plain error), *cert. denied*, 115 S. Ct. 2263 (1995) *with United States v. Brown*, 616 F.2d 844, 846 (5th Cir. 1980) (stating that failure to instruct on a single element is not necessarily plain error). The Supreme Court has granted certiorari in a similar case. *See United States v. Johnson*, 82 F.3d 429 (11th Cir. 1996) (unpublished), *cert. granted*, 117 S. Ct. 451 (Nov. 15, 1996) (No. 96-203).

13

FHLBB regulators to keep the bank open attests to their materiality. Even assuming *arguendo* that they have demonstrated a plain error affecting substantial rights, we find that it does not "seriously affect the fairness, integrity, or public reputation of judicial proceedings," *Calverley*, 37 F.3d at 162 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)), and therefore we exercise our discretion not to correct it.

                                   B.

The Mmahats aver that the instructions prevented the jury from considering authorization to make the loans in question as a defense to the counts charging misapplication of funds. Specifically, the Mmahats take issue with the following sentence:

> I further instruct you that a Board of Directors of a savings and loan cannot validate a fraud on the institution and, therefore, such authorization is not a defense to the crime of misapplication of savings and loan funds as charged in the indictment.

Because the Mmahats did not voice this objection at trial, we again review for plain error. *See* FED. R. CRIM. P. 52(b); *United States v. Breque*, 964 F.2d 381, 387 (5th Cir. 1992), *cert. denied*, 507 U.S. 909 (1993).

As always, we will decline to find error if the charge, viewed in its entirety, is a correct statement of the law that plainly instructs jurors on the relevant principles of law, and, assuming a timely objection, we reverse only if the instructions do not

                                   14

correctly state those principles. *United States v. Allibhai*,
939 F.2d 244, 251 (5th Cir. 1991), *cert. denied*, 502 U.S. 1072
(1992); *United States v. Gray*, 96 F.3d 769, 775 (5th Cir. 1996).
More importantly in this particular instance, our review always
focuses on the charge as a whole and the context in which it was
given, rather than on any particular isolated statement. *United
States v. Flores*, 63 F.3d 1342, 1374 (5th Cir. 1995), *cert. denied*,
117 S. Ct. 87 (1996).

The Mmahats' argument is facially attractive: They were
charged with having made unauthorized loans, yet the instructions
forbade them from defending themselves by arguing that the loans
were authorized. When considered in context, however, the sentence
of which they complain loses its apparent sting.

Within the portion of the charge that is at issue, the
district court first instructed the jury that willfulness and
specific intent were required as to each count of the indictment
and that good faith was a complete defense to each of the crimes
charged. It then proceeded to explain the concept of ratification.
The instruction the Mmahats complain of followed immediately after
the explanation of ratification and referred back to it.

Thus, when the court told the jury that "such authorization"
was not a defense to the misapplication charges, it was referring
to after-the-fact ratification, not before-the-fact authorization.
The jury hardly could have understood the statement otherwise, for

15

as the Mmahats correctly point out, a loan that they were expressly authorized to make simply cannot have been an unauthorized loan.

When viewed in this light, the instruction was plainly correct. Post-hoc ratification by the loan committee could no more absolve the Mmahats of misappropriation than can a sincere apology undo an aggravated assault.[5] Ratification was relevant to specific intent alone, and nothing in the instructions prevented the jury from considering the "defense"SSreally an attack on the prosecution's case-in-chiefSSthat the Mmahats had *ex ante* authorization to make the loans.

### C.

In conjunction with the previous argument, the Mmahats contend that the same instruction's reference to the Board of Directors "validat[ing] a fraud on the institution" effectively "[told] the jury to consider that the defendants had committed fraud" and apprised it of the Mmahats' "bad intent." This, the Mmahats argue, did them "immeasurable harm" by "supplying the evil intentions not contained in the facts." As with their other arguments regarding the jury instructions, the Mmahats' failure to object at trial requires that they demonstrate plain error.

Also as before, the complained-of phrase was not even

---

[5] *See United States v. Cauble*, 706 F.2d 1322, 1354 (5th Cir. 1983) ("Patently an entire bank board, acting unanimously, could not without violating the statute invest bank funds to purchase a boatload of marijuana . . . ."), *cert. denied*, 474 U.S. 994 (1985).

16

incorrect, much less plainly erroneous. Intent to defraud was an element of the misapplication counts. The instruction neither told the jury that a fraud had occurred nor suggested "bad intent"; it merely stated that if a fraud had occurred, ratification would not be a complete defense. Within the context of proceedings in which the government had spent weeks trying to convince the jury that the Mmahats had essentially defrauded Gulf, this was perfectly legitimate.

## VII.

The Mmahats also present a wide range of arguments regarding the sufficiency of the evidence. John Mmahat challenges his convictions on counts three and five on the basis that there was insufficient evidence of lack of approval by Gulf's loan committee for a reasonable jury to find misappropriation. John also challenges his convictions on all counts on the basis that the loans were ratified, that they were interrelated, and, with regard to count six, that no additional funds were advanced.

Joseph Mmahat adopts John's argument with regard to count three and argues that the government failed sufficiently to connect him to the omission from Gulf's records that formed the basis for count four. Joseph also challenges his convictions on all counts on the basis that other individuals were involved in arranging the loans and that the loans were "normal business transactions."

We affirm if a reasonable trier of fact could conclude that

17

the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the jury's verdict and drawing all reasonable inferences from the evidence to support the verdict. The evidence presented at trial need not exclude every reasonable possibility of innocence. *United States v. Faulkner*, 17 F.3d 745, 768 (5th Cir.), *cert. denied*, 115 S. Ct. 193 (1994).

Our review of the record reveals that the Mmahats' sufficiency arguments are weak, and we therefore will not deal with them at length. John's contentions as to counts three and five are refuted by (1) the ample evidence that the Dermul loan was secured only by property worth approximately $60,000, and not by a lien on over $500,000 worth of property, as the loan committee had required; (2) the absence of an application for, and approval of, the K & K loan in the committee's minutes; and (3) the testimony of numerous witnesses. His more general arguments as to all the counts are refuted by (1) the jury's consideration and rejection of his ratification defense, which is an incomplete defense to misappropriation in any case; (2) the jury's consideration and rejection of his argument that the violations relating to subsidiary loans charged in counts six, seven, and eight were part and parcel of the violations charged in counts three and five; and (3) caselaw holding that the government need not show conversion to prove misapplication of funds, *e.g., United States v. Mann*, 517 F.2d 259,

18

268 (5th Cir. 1975), *cert. denied*, 423 U.S. 1087 (1976).

Joseph Mmahat's argument on count three fails for the same reason as John's. His contentions on count four are refuted by ample evidence that he knowingly backdated the incomplete Dermul loan approval sheet. His blanket arguments on all the counts of his conviction virtually refute themselves: The fact that other bank employees were involved in his activities does not make them any less criminal, and the contention that these loans were "normal business transactions" is belied by almost every piece of evidence.

## VIII.

The Mmahats' final argument is that the district court erred in ordering them to pay restitution because under *United States v. Coleman*, 997 F.2d 1101, 1106-07 (5th Cir. 1993), *cert. denied*, 510 U.S. 1077 (1994), their prior civil settlement with the government makes restitution duplicative. Because this would be a sentence-reducing factor if true, the Mmahats bear the burden of demonstrating it. *See United States v. Hughey*, 877 F.2d 1256, 1265 (5th Cir. 1989), *rev'd on other grounds*, 495 U.S. 411 (1990); *see also United States v. Cuellar-Flores*, 891 F.2d 92, 93 (5th Cir. 1989). Aside from conclusory assertions, however, neither defendant has attempted to adduce any evidence that the civil settlement overlapped the restitution order§§indeed, Joseph Mmahat did not even object to the order. In *Coleman*, the defendants presented

19

extensive evidence as to overlap with an earlier civil settlement. *Coleman*, 997 F.2d at 1107. Because the Mmahats did not do so, the district court did not err in ordering restitution.

IX.

For the foregoing reasons, John Mmahat's conviction is AFFIRMED. The proceedings against Joseph Mmahat are AFFIRMED to the extent that they support the restitution order, and in all other respects are VACATED.