**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 98-50372

UNITED STATES OF AMERICA,

Plaintiff-Appellee;

VERSUS

ROBERT FRANK STEWART, SR, also known as Frank R Odom,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas
(A-97-CR-045)

January 6, 2000

Before JONES, STEWART, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Robert F. Stewart, Sr., defendant-appellant, was convicted by a jury of four violations of the Interstate Stalking Act, 18 U.S.C. § 2261A. The district court sentenced Stewart and committed him to the custody of the United States Bureau of Prisons to be imprisoned for a term of 240 months, consisting of a 60 month period of imprisonment on each of his four counts of conviction to run consecutively. The district court also ordered the defendant to pay to the United States a special assessment of $100 to the Crime

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Victims Fund under 18 U.S.C. § 3013 for each of the four counts of his convictions, to serve a term of three years supervised release from imprisonment, and to pay a fine of $50,000. The defendant appealed.

Robert F. Stewart, Sr., defendant-appellant, died on November 10, 1999 while this appeal was pending. Prior to his death, Stewart, pursuant to the district court's order, paid $400 to the Crime Victims Fund and $158 of the $50,000 fine. This court has adopted the general rule that the death of a criminal defendant pending his appeal from his conviction abates the entire criminal proceedings from its inception, including the appeal, conviction, sentence, and indictment. *See United States v. Mmahat,* 106 F.3d 89, 93 (5th Cir. 1997); *United States v. Asset*, 990 F.2d 208, 210 (5th Cir. 1993); *United States v. Schuster*, 778 F.2d 1132, 1133 (5th Cir. 1985); *United States v. Pauline*, 625 F.2d 684, 684-85 (5th Cir. 1980). The principal reason for this rule is that, after the defendant dies, criminal punishment serves no legitimate purpose. *See Asset,* 990 F.2d at 212; *United States v. Morton*, 635 F.2d 723, 725 (8th Cir. 1980). Consistent with the rationale of the general rule, however, we have held that an order in connection with the judgment of conviction and sentence requiring the defendant to make restitution or compensatory payments for the benefit of crime victims survives the defendant's death because it does not constitute punishment. *See Mmahat*, 106 F.3d at 93; *Asset*, 990 F.2d at 213-14. In such a case, "only the portion of the proceedings unrelated to the restitution order is abated." *Mmahat*, 106 F.3d at

93 (citing *United States v. Dudley*, 739 F.2d 175, 179 (4th Cir. 1984)); *see also Asset*, 990 F.2d at 211 ("[T]he courts have consistently interpreted the abatement principle to apply only to penal aspects of the criminal proceeding.").

Accordingly, all of Stewart's criminal proceedings related to criminal punishment, rather than restitution or compensation of crime victims, including his convictions, sentences of imprisonment, and the unpaid portion of his fine, must be abated ab initio. We reject the suggestion or motion and argument of Stewart's appellate counsel, in behalf of Stewart's estate, that a continuance of his appeal for a full consideration of his substantive arguments, as in *United States v. Mmahat*, 106 F.3d 89, 93-98 (5th Cir. 1997), must result in our conclusion that Stewart's convictions were flawed by reversible error requiring a return of the $400 assessments and the $158 paid portion of the fine to Stewart's estate. Assuming arguendo that such a review is called for in this case, and without deciding whether the Crime Victims Fund assessments in this case are penal or compensatory, our full consideration of the oral and written arguments of counsel, the record, and additional study and research, convinces us that no error requiring a reversal of Stewart's convictions occurred. For these reasons, this appeal is dismissed as moot, and the case is remanded with directions to the District Court to vacate the convictions and sentences, except for the $400 payment to the Crime Victims Fund and the $158 portion of the fine paid by Stewart before his death, and to dismiss the indictment.

REMANDED WITH DIRECTIONS.

DENNIS, Circuit Judge, concurring:

I respectfully concur and assign the following as my reasons for joining in the conclusions we have reached.

Robert Frank Stewart, Sr., defendant-appellant, ("Stewart" and "defendant"), was convicted by a jury of four violations of the Interstate Stalking Act, 18 U.S.C. § 2261A, which makes it illegal for a person to [1] "travel[] across a State line...with the intent to injure or harass another person, and [2] in the course of, or as a result of, such travel [3] place[] that person in reasonable fear of the death of, or serious bodily injury...to that person or a member of that person's immediate family...."[2]  The gravamen of the charges against Stewart was that he traveled from Montgomery, Alabama to Georgetown, Texas, with the intent to injure or harass Doris Stewart, his former wife, and their three adult sons, and that he knowingly placed each of them in reasonable fear of death or serious bodily harm.

On appeal, Stewart argued that: (1) the Interstate Stalking Act is an unconstitutional use of Congressional legislative power under the Commerce Clause; (2) the Act violates the Due Process Clause because it is void for vagueness and unconstitutionally overbroad; and (3) the trial court erred in its jury instructions defining the

---

[2]The full text of 18 U.S.C. § 2261A is: "Whoever travels across a State line or within the special maritime and territorial jurisdiction of the United States with the intent to injure or harass another person, and in the course of, or as a result of, such travel places that person in reasonable fear of the death of, or serious bodily injury (as defined in section 1365(g)(3) of this title) to, that person or a member of that person's immediate family (as defined in section 115 of this title) shall be punished as provided in section 2261 of this title."

charged offenses.[3]

## I. Congressional Authority Under The Commerce Clause

The defendant contends that the Interstate Stalking Act is unconstitutional because it exceeds Congress' authority under the Commerce Clause. This Court reviews the constitutionality of statutes *de novo.* *United States v. Luna*, 165 F.3d 316, 319 (5th Cir. 1999).

In *United States v. Lopez,* 514 U.S. 549 (1995), the Supreme Court held that the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q) "exceeds the authority of Congress '[to] regulate Commerce...among the several States....' U.S. CONST. art. I, § 8, cl. 3." *Lopez,* 514 U.S. at 551. In analyzing the statute, the Court "identified three broad categories of activity that Congress may regulate under its commerce power":

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate

[3]Stewart also assigned as errors: (1) the trial court violated his First Amendment right to access the courts by allowing the prosecution to argue that the child custody and visitation suits Stewart filed in Texas state court evinced that he traveled between states with the intent of harassing other persons; (2) the trial court's denial of his eleventh hour requests to vacate its order allowing Stewart to represent himself, to reappoint counsel Stewart had previously rejected, and for a continuance for additional trial preparation; (3) the defendant's indictments are multiplicitous and violate his constitutional right against double jeopardy; (4) the trial court erred in departing from the Sentencing Guidelines. None of the first three assignments has merit. In view of the abatement of Stewart's sentences upon his death and their irrelevance to a review of the proceedings with respect to his conviction, the fourth assignment is moot.

activities. Finally, Congress' commerce authority includes...those activities that substantially affect interstate commerce.[4]

*Id.* at 558-59 (internal citations omitted). The Court then turned to consider the power of Congress, in light of this framework, to enact the Gun-Free School Zones Act, which made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(1)(A) (1988). The Court quickly concluded that § 922(q) is not a regulation of the use of channels of interstate commerce or a regulation by which Congress has sought to protect an instrumentality of interstate commerce, or persons or things in interstate commerce. *See Lopez,* 514 U.S. at 559. After an extensive analysis of its Commerce Clause opinions, the *Lopez* Court held, in a perhaps "epochal" decision, that the Congressional enactment of § 922(q) could not be sustained, even under the third category as a regulation of activities that "substantially affect" interstate commerce. *Id.* at 559-68; *see also id.* at 614-15 (Souter, J., dissenting).

*Lopez* is most likely to have a significant impact on the application of the substantial effects test to intrastate activity that is not commercial or economic in nature. *See* TRIBE, § 5-5, at

---

[4] "As the Court's articulation of these categories indicated, and as the Court confirmed the following week in *United States v. Robertson*, [514 U.S. 669 (1995)] the 'substantial effects' requirement applies only to the third category; the first two categories, *by definition,* substantially affect––because they are *components of*––interstate commerce." LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 5-5, at 826-27 (3d ed. 1999)(emphasis in original) (footnote omitted) [hereinafter TRIBE].

825. But as Professor Tribe astutely observed, "[a]t least as important...is what *Lopez* did not touch[:][T]he majority opinion seemingly declared the Court's allegiance to rational basis review, aggregation, and the substantial effects principle [and] reaffirmed Congress' plenary power over the channels and instrumentalities of interstate commerce, as well as its power over objects and persons that are in some sense participating directly 'in' interstate commerce and over activities jurisdictionally 'connected' to interstate commerce." TRIBE, § 5-5, at 825-26 (citing *Lopez*, 514 U.S. at 559, 561, 599) (footnotes omitted).

In *Lopez*, 514 U.S. at 558, the Court, in identifying the "channels" category, cited and quoted from *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964)("'[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.'")(quoting *Caminetti v. United States*, 242 U.S. 470, 491 (1917)) and cited *United States v. Darby*, 312 U.S. 100, 114 (1941)("Congress, following its own conception of public policy concerning the restrictions which may appropriately be imposed on interstate commerce, is free to exclude from [such] commerce articles whose use in the states for which they are destined it may conceive to be injurious to the public health, morals, or welfare, even though the state has not sought to regulate their use.").

The *Lopez* Court cited as identifying the "instrumentalities" and "persons in" category, inter alia, *Southern R. Co. v. United*

8

*States*, 222 U.S. 20 (1911)(Safety Appliance Act amendments applying to vehicles used in intrastate commerce) and *Perez v. United States*, 402 U.S. 146, 150 (1971)("[F]or example, the destruction of an aircraft (18 U.S.C. § 32), or...thefts from interstate shipments (18 U.S.C. § 659)"). In *United States v. Robertson*, 514 U.S. 669 (1995), decided the week following *Lopez*, the Court indicated that regulation of a "person in" interstate commerce includes, for example, the application of the RICO statute to a gold mine operator who receives equipment from other states and solicits workers from other states. *See* TRIBE, § 5-5, at 829.

The Court in *Lopez* reaffirmed Congress' power to enact statutes having a "jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Lopez,* 514 U.S. at 561. As an example, the Court pointed to the felon-in-possession statute, former 18 U.S.C. § 1202(a), which made it a crime for a felon to "receiv[e], posses[s], or transpor[t] in commerce or affecting commerce...any firearm." *Lopez,* 514 U.S. at 561 (citing *United States v. Bass,* 404 U.S. 336 (1971)). Unlike the felon-in-possession statute, the Court observed, the Gun-Free School Zones Act "has no express jurisdictional element which might limit its reach to a discrete set of firearms possessions that additionally have an explicit connection with or effect on interstate commerce." *Lopez,* 514 U.S. at 562. The Court cited with approval its decision in *Bass*, in which the Court had interpreted the possession component of the felon-in-possession statute to require an additional nexus to

9

interstate commerce, viz., that the possession was in commerce or affected commerce. *See Lopez,* 514 U.S. at 561. Accordingly, it is apparent that *Lopez* left "largely untouched" Congress' power to enact "statutes containing a jurisdictional element expressly requiring the trier of fact to find some sort of connection or link to interstate commerce as a precondition of a given statute's applicability to the case at hand." TRIBE, § 5-5, at 829.

Under the precepts reaffirmed by *Lopez*, the Interstate Stalking Act does not exceed Congressional power, but is a valid regulation of (1) the use of the channels of interstate commerce, (2) persons participating directly in such commerce, and (3) activities jurisdictionally connected to interstate commerce. The statute prohibits persons from using interstate channels of transportation for the purpose of placing others in reasonable fear of death or serious bodily harm. The Act regulates the conduct of persons and protects persons participating directly in interstate commerce. And the statute has an express jurisdictional element which limits its reach to a discrete class of travel (by persons with intent to injure or harass others and who place others in reasonable fear of death or serious bodily harm) that additionally has an explicit connection with or effect on interstate commerce.

Nevertheless, Stewart claims support for his Commerce Clause challenge on passages from *Caminetti v. United States*, 242 U.S. 470, 491 (1917)("It may be conceded, for the purpose of argument, that Congress has no power to punish one who travels in interstate commerce merely because [that person] has the intention of

10

committing an illegal or immoral act at the conclusion of the journey.") and *Rewis v. United States*, 401 U.S. 808, 811-12 (1971)("[The Travel Act, 18 U.S.C. § 1952,] prohibits interstate travel with the intent to 'promote, manage, establish, carry on, or facilitate' certain kinds of illegal activity; and the ordinary meaning of this language suggests that the traveler's purpose must involve more than the desire to patronize the illegal activity....[Otherwise,] the geographic origin of customers, a matter of happenstance, would transform relatively minor state offenses into federal felonies.").[5]    Contrary to Stewart's

_____

[5] The *Rewis* case provides additional precedent for upholding the Interstate Stalking Act. The Supreme Court in *Rewis* held that defendants who ran a gambling operation illegally under Florida law, but who had not crossed state lines in that connection, could not be convicted of violation of the Travel Act merely because their gambling operation was frequented by out-of-state bettors. *Rewis*, 401 U.S. at 811. The Travel Act, 18 U.S.C. § 1952, which is similar in some respects to the Interstate Stalking Act, makes it unlawful, inter alia, to "travel in interstate or foreign commerce...with the intent to...(2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on...any unlawful activity, and thereafter perfor[m] or attemp[t] to perform any of the acts specified in [the above subparagraphs]." Significantly, however, the Supreme Court in *Rewis* emphasized that "there are cases in which federal courts have correctly applied [the Travel Act] to those individuals whose agents or employees cross state lines in furtherance of illegal activity." *Id.* at 813 (citing, *e.g.*, *United States v. Chambers*, 382 F.2d 910, 913-14 (6th Cir. 1967); *United States v. Barrow*, 363 F.2d 62, 64-65 (3d Cir. 1966), *cert. denied*, 381 U.S. 1001 (1967); *United States v. Zizzo*, 338 U.S. 557, 580 (7th Cir. 1964), *cert. denied*, 381 U.S. 915 (1965)).
    In *Zizzo* the Seventh Circuit held that "Congress had the power, under the Commerce Clause, to make it unlawful to travel from one state to another to promote a gambling enterprise which was illicit by the laws of the state where the gambling was carried on." *Zizzo*, 338 F.2d at 579. While a constitutional issue was not raised on appeal in *Chambers*, the Third Circuit in *Barrow* held that the Travel Act was not unconstitutional as involving a local activity beyond the reach of Congressional authority under the Commerce Clause in application to employees of a Pennsylvania

contention, however, the Interstate Stalking Act does not criminalize "mere travel with intent."  Rather, the statute prohibits crossing a state line with an evil intent, and then placing persons in reasonable fear of death or bodily injury to themselves or family members.  Therefore, the Act falls within Congress' authority "to keep the channels of interstate commerce free from immoral and injurious uses." *Caminetti*, 242 U.S. at 491; *see also United States v. Wright*, 128 F.3d 1274, 1276 (8th Cir. 1997)(disposing of a similar argument under the Violence Against Women Act).

Finally, the Interstate Stalking Act is similar in purpose and effect to its precursor, the Violence Against Women Act ("VAWA"), 18 U.S.C. §§ 2261-66, which consistently has been sustained against Commerce Clause challenges by other Circuits.  *See, e.g., United States v. Page,* 167 F.3d 325, 335 (6th Cir. 1999) (concluding that 18 U.S.C. § 2261(a)(2), which forbids a person to "cause[] a spouse or intimate partner to cross a State line...by force, coercion, duress, or fraud and, in the course or as a result of that conduct, intentionally commits a crime of violence and thereby causes bodily injury to the person's spouse or intimate partner," is a valid exercise of Congress' power to regulate the use of the channels of

---

gambling casino, being operated in violation of state laws, who traveled to work from their New Jersey homes. *See Barrow*, 363 F.2d at 65.  Thus, the Supreme Court's decision in *Rewis*, by approving the decisions in *Zizzo* and *Barrow*, by analogy supports upholding the  application of the Interstate Stalking Act to the activity of Stewart in traveling across state lines from Alabama to Texas, with the intent to engage in  certain acts of harassment, even though part of his activity was a criminal offense under the laws of Texas.

12

interstate commerce); *United States v. Gluzman,* 154 F.3d 49, 50 (2d Cir. 1998) (finding that 18 U.S.C. § 2261(a)(1), which makes punishable "[a] person who travels across a State line...with the intent to injure, harass, or intimidate that person's spouse or intimate partner, and who, in the course of or as a result of such travel, intentionally commits a crime of violence and thereby causes bodily injury to such spouse or intimate partner," is a valid regulation of the channels of interstate commerce); *United States v. Von Foelkel,* 136 F.3d 339, 341 (2d Cir. 1998) (holding that 18 U.S.C. § 2262(a)(1)(A)(i), which criminalizes crossing a state line with the intent to violate a protection order and then violating it, does not exceed Congress' authority to regulate the use of the channels and instrumentalities of interstate commerce); *United States v. Wright,* 128 F.3d 1274, 1275 (8th Cir. 1997) (holding to the same effect as *Von Foelkel*); *United States v. Bailey,* 112 F.3d 758, 766 (4th Cir. 1997)(holding that 18 U.S.C. § 2261(a)(2) upheld as a valid exercise of the authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses); *cf. Brzonkala v. Virginia Polytechnic Inst. and State Univ.*, 169 F.3d 820, 836 (4th Cir. 1999)(en banc)(finding that VAWA § 40302, 42 U.S.C. § 13981, creating a private cause of action against any person who commits a crime of violence motivated by gender, was not within the power of Congress under the Commerce Clause-- "Although the criminal statutes enacted by Congress as part of the Violence Against Women Act [18 U.S.C. §§ 2261-66] predicate liability on the crossing of state lines...[42 U.S.C. §] 13981

includes no similar jurisdictional requirement[.]").

## II. Statutory Indefiniteness and Statutory Construction

Stewart contends on appeal that the Interstate Stalking Act, facially and as applied, is void for vagueness and overbreadth because of its use of the ambiguous term "harass" and because it "fails to specify what acts are required to place a person in fear and thus [fails to] place the Defendant on notice of what acts constitute a crime[.]" Additionally, he argues that the statute creates a "status" crime because it permits government officials to arrest, prosecute, and punish an individual for his status as a "feared person" rather than for his conduct.

The prosecution contends that the district court correctly interpreted and applied the statute in its jury instructions; that the court, in response to the jury's request, adequately defined the term "harass" as used in the material element of traveling across a state line with the intent to injure or harass; that in the statute and the jury instructions "the use of the qualifying words 'as a result' or 'placed'...and the phrase 'in the course of'...do suggest and seem to require some affirmative actions on the part of the defendant at a time contemporaneous with the travel[;]" and that the statute and the jury charge did not permit the defendant to be convicted solely because of his status as a feared person.

In order to evaluate the parties' arguments, the first task is to determine the meaning of the statute as intended by Congress. "The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes,

14

which are solely creatures of statute." *Liparota v. United States*, 471 U.S. 419, 424 (1985) (citing *United States v. Hudson*, 7 U.S. (Cranch) 32 (1812)). In particular, "courts obviously must follow Congress' intent as to the required level of mental culpability for any particular offense. Principles derived from common law as well as precepts suggested by the American Law Institute must bow to legislative mandates[]", including legislative language and history. *United States v. Bailey*, 444 U.S. 394, 406 (1980).

The Interstate Stalking Act, 18 U.S.C. § 2261A, makes it unlawful for a person to (1) travel across a state line with the intent to injure or harass another person, and (2) place that other person in reasonable fear of death or serious bodily injury to himself or a member of his immediate family, if (3) the offender places that victim in such fear in the course of, or as a result of, such travel. In enacting 18 U.S.C. § 2261A, Congress certainly intended by use of the word "intent" to require some mental state with respect to one or more of the material elements of the statute. Beyond this, however, Congress did not explicitly spell out the mental state or states required. Nor did Congress expressly define the term "harass" used in the statute.

The Supreme Court has recognized that the required mental state of mind may be different for different elements of a crime. *See Liparota*, 471 U.S. at 423, n.5 (citing *Bailey*, 444 U.S. at 405-06; *United States v. Freed*, 401 U.S. 601, 612-14 (1971)(Brennan, J., concurring)); *see also* Robinson & Grall, *Element Analysis in Defining Criminal Liability: The Model Penal Code and Beyond*, 35

15

STAN.L.REV. 681 (1983). "'[C]lear analysis requires that the question of the kind of culpability required to establish the commission of an offense be faced separately with respect to each material element of the crime[.]'" *Bailey*, 444 U.S. at 406 (quoting MODEL PENAL CODE § 2.02, Comments, p. 123 (Tent. Draft No. 4, 1955)); *see also United States v. X-Citement Video,* 513 U.S. 64, 72 (1994) ("*Morissette*, reinforced by *Staples*, instructs that the presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct"); *United States v. Feola*, 420 U.S. 671 (1975); *United States v. Ahmad,* 101 F.3d 386, 391 (5th Cir. 1997).

The Court has also noted that the mental element in criminal law encompasses more than the two possibilities of "specific" and "general" intent. *See Liparota*, 471 U.S. at 423, n.5 (citing *Bailey*, 444 U.S. at 403-07; *United States v. United States Gypsum Co.*, 438 U.S. 422, 444-45 (1978); *Freed*, 401 U.S. at 613 (Brennan, J. concurring)). The four mental states recognized by the ALI MODEL PENAL CODE §2.02 -- purpose, knowledge, recklessness, and negligence -- have implicitly been endorsed by the Supreme Court as clear and comparatively unambiguous categories describing the various kinds of culpability that may be required by federal criminal statutes. *See, e.g., Liparota*, 471 U.S. at 423; *Bailey*, 444 U.S. at 405; *Gypsum*, 438 U.S. at 444.

In *Bailey*, the Court distinguished between the mental states of "purpose" and "knowledge", explaining that, "except in narrow classes of offenses, proof that the defendant acted knowingly is

16

sufficient to support a conviction." *Bailey,* 444 U.S. at 408; *see also Posters 'N' Things Ltd. v. United States*, 511 U.S. 513, 523 (1994). As examples of classes of crimes in which heightened culpability has been thought to merit special attention, the Court cited the statutory and common law of homicide, treason, and inchoate offenses. *See Bailey,* 444 U.S. at 405.

The Interstate Stalking Act was modeled on the Interstate Domestic Violence Act, 18 U.S.C. § 2261, which, in pertinent part, provides: "A person who travels across a State line...with the intent to injure, harass, or intimidate that person's spouse or intimate partner, and who, in the course of or as a result of such travel, intentionally commits a crime of violence and thereby causes bodily injury to such spouse or intimate partner, shall be punished as provided in subsection (b)." The legislative history of the Interstate Stalking Act demonstrates that it was enacted to extend § 2261's protection against spousal and intimate partner stalking to victims of non-spousal and non-intimate partner stalking. Senator Hutchison, who proposed the Interstate Stalking legislation, stated:

> [W]e are not federalizing the crime of stalking. Stalking is and will remain a State crime, subject to State jurisdiction and sanction. But under the bill I am proposing, if a stalker crosses State lines, then Federal resources can be brought to bear to ensure the stalker is caught and stopped, the same protection we provided last year for victims of domestic violence.

142 CONG. REC. S4804-02, S4804-4805 (daily ed. May 7, 1996) (statement of Sen. Hutchison). The Department of Justice advised Congress that it viewed the proposed legislation as modeled on the

17

existing interstate domestic violence offense, 18 U.S.C. § 2261, and covering travel across a state line with the intent to harass another person "where the actor in the course of, or as a result of, such travel places that person in reasonable fear of death or serious bodily injury to the person or an immediate family member." H.R. REP. No. 104-557, at 5 (1996). The Department of Justice supported the legislation because "it fills a gap in existing federal law, which reaches interstate domestic violence (under 18 U.S.C. § 2261) and interstate violations of protection orders (under 18 U.S.C. § 2262), but does not cover essentially similar types of conduct where the victim has not had an intimate relationship with the offender and has not obtained a protection order." *Id.* The Justice Department also noted that the Act "will provide a supplementary measure for cases where the interstate nature of the offense may create difficulties for effective state investigation and prosecution." *Id.*

The text, structure, history, and purpose of the Interstate Stalking Act indicate that a violation of § 2261A requires that the offender must have crossed a state line with the knowledge that he would injure or harass a person, and that the offender, in the course of or as a result of such travel, must have knowingly caused that person to be placed in reasonable fear of death or serious bodily harm. Criminalization of this pattern of intentional conduct resembles that prohibited by the provisions of 18 U.S.C. § 2261 (the interstate domestic violence statute), upon which the Interstate Stalking Act, 18 U.S.C. § 2261A, was modeled. Section 2261(a)(1)

18

criminalizes crossing a state line with the intent to injure, harass, or intimidate a spouse or intimate partner and intentionally committing a crime of violence that causes bodily injury to such spouse or partner. *See Gluzman*, 154 F.3d at 50. Section 2262(a)(1)(A)(i) criminalizes crossing a state line with the intent to engage in conduct that violates a protection order and subsequently intentionally engaging in that conduct. *See Von Foelkel*, 136 F.3d at 341. The legislative history of § 2261A does not indicate that Congress intended to create a kind of non-fault based criminal liability that could arise merely from the offender having crossed a state line with the intent to harass another person and then unintentionally causing that person to be placed in reasonable fear of death or serious bodily harm. Such a federal criminal law would deviate markedly from the statute upon which § 2261A was modeled and far exceed the scope of the proposed interstate stalking legislation described by Senator Hutchison and the Department of Justice, viz., a measure that does not federalize stalking crimes, but only supplements typical state stalking laws, and merely extends the protection of its model, § 2261, to non-spouse and non-intimate partner victims.

The words "harass" and "harassment" may convey different meanings depending upon the context in which they are used. BLACK'S LAW DICTIONARY 717 (6th ed. 1990) notes that the term "harassment" "is used in a variety of legal contexts to describe words, gestures and actions which tend to annoy, alarm and abuse (verbally) another person; e.g., the use of 'obscene or profane language or language

19

the natural consequence of which is to abuse the hearer or reader' is unlawful harassment under the Federal Fair Debt Collection Practices Act. 15 U.S.C.A. § 1692(d)(2)." *See also* 15 U.S.C. § 1692c et seq. (prohibiting harassment tactics such as threats, abusive language, or telephone excesses). As defined in 18 U.S.C. § 1514(c), which provides a civil action to restrain harassment of a victim or a witness in a federal criminal case, "harassment" means "a course of conduct directed at a specific person that causes substantial emotional distress in such person and serves no legitimate purpose." Under MODEL PENAL CODE § 250.4, harassing another may include making a telephone call without purpose of legitimate communication; insults, taunts or challenges in a manner likely to provoke violent or disorderly response; repeated anonymous communications at extremely inconvenient hours, or in offensively coarse language; offensive touching, or any other course of alarming conduct serving no legitimate purpose of the actor. In ordinary usage "harass" may mean to irritate or torment persistently; to wear out, exhaust; to impede and exhaust (an enemy) by repeated attacks or raids. *See* THE AMERICAN HERITAGE COLLEGE DICTIONARY 618 (3d ed. 1993).

When the text, structure, history, and purpose of a criminal statute fail to establish its meaning unambiguously, doubts are resolved in favor of the defendant. *See, e.g., United States v. Granderson*, 511 U.S. 39, 54 (1994); *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 285 (1978); *United States v. Levy*, 579 F.2d 1332, 1337 (5th Cir. 1978); *see also Cispes v. Federal Bureau of Investigation*, 770 F.2d 468, 476 (5th Cir. 1985)("Although the term

["harass"] considered on its own might otherwise arguably present a possibility of arbitrary and discriminatory enforcement....[w]hen considered in the context of the rest of the statute, especially as we have construed it, supra, the meaning and scope of the word becomes clear.")

Applying these precepts, I conclude that to "harass" another person within the context of § 2261A means to place that person in reasonable fear of death or serious bodily harm to himself or to a member of his immediate family. The purpose of the statute is to prevent any person from being placed in such fear by the intentional act of an interstate stalker. The legislative history confirms that it was Congress' intention to protect persons from such fear and not from less severe harassments that do not cause fear for life or personal safety. *See* Senator Hutchison's remarks, 142 CONG. REC. S4804-02 ("Mr. President, I am introducing legislation today to strengthen the protections our society offers to stalking victims, those individuals whose stories we so often hear only after they end in tragedy....Freedom from fear is one of the most cherished advantages we are supposed to enjoy in our country, but stalking victims have been robbed of that freedom.")[6]

For the foregoing reasons, absent indication of a contrary purpose in the language or legislative history of the statute, I

---

[6]Consequently, it is unwarranted to assume, as the trial court did in the present case, that exposure to criminal liability under the Interstate Stalking Act can be triggered by crossing a state line with an intent to cause any "substantial emotional distress", which is the minimum level of harassment that may be restrained in a civil action to protect the mental composure of witnesses and victims in federal criminal cases. *See* 18 U.S.C. § 1514.

21

believe that § 2261A requires (1) a showing that the defendant knew when he crossed a state line that it was practically certain that he would engage in future conduct to injure a particular person or harass that person by placing him or her in reasonable fear of death or serious bodily injury to that person or to a member of that person's immediate family, and (2) a showing that the defendant engaged in conduct with present awareness that it was practically certain to place that person in such reasonable fear of death or serious bodily injury.  "'The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion.  It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.'"  *Liparota*, 471 U.S. at 425 (quoting *Morissette v. United States*, 342 U.S. 246, 250 (1952)).  Thus, the Supreme Court has noted that "'[c]ertainly far more than the simple omission of the appropriate phrase from the statutory definition is necessary to justify dispensing with an intent requirement' and that criminal offenses requiring no mens rea have a 'generally disfavored status.'"  *Liparota*, 471 U.S. at 426 (quoting *Gypsum*, 438 U.S. at 438).  Similarly, in the present case, "the failure of Congress explicitly and unambiguously to indicate whether mens rea is required" in connection with placing a person in reasonable fear of death or serious bodily injury "does not signal a departure from

22

this background assumption of our criminal law."[7]  *Liparota,* 471 U.S. at 426.

This construction is particularly appropriate where, as here, to interpret the statute otherwise would be to criminalize a possibly broad range of conduct not normally considered criminally reprehensible.  A strict reading of § 2261A with no limitation on the term "harass" and no requirement that the offender commit an act with present knowledge that it was practically certain to place the victim in fear of death or serious harm would thus make a felon of a person who, for example, crossed a state line knowing he thereafter would engage in conduct to annoy a particular person but ended up doing something accidentally and unintentionally that placed that person in fear of death or serious harm.  Given the language and legislative history of § 2261A, however, such a sweeping interpretation of the statute is not justified.

In addition, requiring mens rea in connection with the material element of placing a person in reasonable fear of death or serious harm and construing the term "harass" narrowly as referring to such dreadful conduct are in keeping with the longstanding recognition of the principle that "ambiguity concerning the ambit of criminal

---

[7]*See also United States v. X-Citement Video, Inc.,* 513 U.S. 64, 69 (1994) (interpreting the Protection of Children Against Sexual Exploitation Act of 1977 to require that the scienter requirement 'knowingly' apply to all statutory elements, refusing to assume that Congress intended to sweep unintentional behavior within the statute's ambit); *United States v. Ahmad,* 101 F.3d 386, 391 (5th Cir. 1997) ("[W]e hold that the offenses charged in counts one and two are not public welfare offenses and that the usual presumption of a mens rea applies.  With the exception of purely jurisdictional elements, the mens rea of knowledge applies to each element of the crimes.").

statutes should be resolved in favor of lenity." *Liparota*, 471 U.S. at 427 (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)) (citing *U.S. Gypsum*, 438 U.S. at 437; *United States v. Bass*, 404 U.S. 336, 347-48 (1971); *Bell v. United States*, 349 U.S. 81, 83 (1955); *United States v. Universal CIT Credit Corp.*, 344 U.S. 218, 221-22 (1952)).  "Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." *Liparota*, 471 U.S. at 427.  "The rule of lenity is not to be applied where to do so would conflict with the implied or expressed intent of Congress, but it provides a time-honored interpretive guideline when the congressional purpose is unclear." *Id.*

Finally, the Supreme Court has recognized that "[h]istorically, the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with mens rea."  *See Staples v. United States,* 511 U.S. 600, 616 (1994).  In *Staples,* the Court found that the "harsh penalty" of up to ten years imprisonment imposed by a statute demands "significant consideration in determining whether the statute should be construed as dispensing with mens rea."  *See Staples,* 511 U.S. at 616; *see also United States v. Anderson,* 885 F.2d 1248, 1254 (5th Cir. 1989) (en banc) (finding ten year prison sentence for gun possession under the National Firearms Act, 26 U.S.C. § 5861, excessive in the absence of an express mens rea

24

requirement).  The punishment for an offense under 18 U.S.C. § 2261A may range from 5 years imprisonment to life imprisonment, depending on the severity of consequences to the victim.  *See* 18 U.S.C. §§ 2262(b) and 2261A.

Under the foregoing construction of the Interstate Stalking Act, it is not unconstitutionally vague or overbroad: (1) "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).   The Supreme Court has recognized that the doctrine's requirement of minimal statutory guidelines to govern law enforcement is even more important than its mandate of notice or fair warning.  *Id.*  As interpreted above, 18 U.S.C. § 2261A would give adequate warning of the activities it proscribes and would not permit "'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'"  *Id.* at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 575 (1974)). (2) In principle, a person to whom a statue may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the court.  *See Broadrick v. Oklahoma*, 413 U.S. 601, 610-16 (1973).  This rule is subject only to a few limited exceptions   supported   by   the   most   weighty   of   countervailing

25

policies.[8]  *See id.* at 611.  Facial overbreadth claims have not been allowed when a limiting construction has been or could be placed on the challenged statute, and they have been curtailed, if entertained at all, when invoked against ordinary criminal laws that are sought to be applied to protected conduct.  *See id.* at 613.  "[W]here conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 615.  Applying these precepts, I conclude that § 2261A, as limited by the foregoing construction, is not substantially overbroad and that any overbreadth that may exist should be cured through case-by-case analysis of the fact situations to which it assertedly may not be applied.  *See id.* at 615-16.

Moreover, the Supreme Court's cases have long held that a statute as construed may be applied to conduct occurring prior to the construction, provided such application affords fair warning to the defendant.  *See Osborne v. Ohio*, 495 U.S. 103, 115-16 (1990) (citing *Dombrowski v. Pfister*, 380 U.S. 479, 491 n.7 (1965); *Hamling v. United States*, 418 U.S. 87, 114-16 (1974)).

---

[8] *E.g.*, "[w]here individuals not parties to a particular suit stand to lose by its outcome and yet have no effective avenue of preserving their rights themselves", *Broadrick,* 413 U.S. at 611; in the First Amendment area, attacks on overly broad statutes have been permitted by persons whose conduct could not be regulated by a statute drawn with the requisite specificity; where the rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations; where statutes purport to regulate the time, place and manner of expressive conduct; and where laws delegated standardless discretionary power to local functionaries, resulting in virtually unreviewable prior restraints on First Amendment rights. *See id.* at 612-13.

Like the defendants in *Osborne* and *Hamling*, Stewart had notice that the conduct, in which the jury reasonably could have found that he had engaged, was proscribed.  It is evident from the face of § 2261A that the goal of the statute is to prevent persons from being placed in reasonable fear of death or serious bodily harm due to the conduct of an interstate stalker.  It hardly needs elaboration that the jury reasonably could have found from the evidence of Stewart's history of physically abusive treatment of his former wife Doris and their three sons, and from the evidence of his more recent threats to kill them in the few weeks or months before his trip,  that Stewart traveled from Alabama to Georgetown, Texas knowing that his activities there would place them in fear for their lives and that he in fact engaged in conduct there which he knew would place them in reasonable fear of death or serious bodily harm to themselves or their immediate families.  Therefore, although § 2261A as written may not have been precisely contoured,  someone in Stewart's position would not be surprised to learn that his conduct in this case constituted a crime.  *See Osborne,* 495 U.S. at 116.

Because Stewart had notice that the conduct with which he was charged was criminal, his case differs from others in which defendants' convictions were reversed on due process grounds because of an appellate court's unforeseeable judicial expansion of the scope and terms of criminal statutes to criminalize their conduct retroactively. *See, e.g., Osborne*, 495 U.S. at 117; *Marks v. United States*, 430 U.S. 188 (1977)(retroactive  application of judicially broadened obscenity standard); *Rabe v. Washington,* 405 U.S. 313

27

(1972)(unexpected judicial expansion of state obscenity statute); *Bouie v. City of Columbia*, 378 U.S. 347 (1964)(state trespass statute expanded beyond its proscription of unauthorized entry to criminalize sit-in demonstrators' refusal to leave a restaurant).

Although Stewart's vagueness and overbreadth challenges must be rejected for the foregoing reasons, it must still be determined whether Stewart's convictions were, unfairly and in plain error, based on jury instructions as to the literal terms of §2261A rather than upon instructions consistent with the foregoing construction of the statute. *See Osborne,* 495 U.S. at 125; *Shuttlesworth v. City of Birmingham,* 382 U.S. 87, 92 (1965).

### III. Review For Plain Error In Jury Instructions

Stewart did not object at trial to the court's jury instructions regarding the culpability requirements and the meaning of "harass" within the context of § 2261A. Therefore, this court may notice and correct any defects or errors with respect to these instructions only as "plain error" under Federal Rule of Criminal Procedure 52(b). Under Rule 52(b), before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights; if all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See Johnson v. United States*, 520 U.S. 461, 462 (1997); *United States v. Olano*, 507 U.S. 725, 732 (1993); *United States v. Young*, 470 U.S. 1, 15 (1936).

28

In submitting the case to the jury, the district court instructed the jury as follows:

Count 1 of the indictment charges that on or about March 11th, 1997, within the Western District of Texas and elsewhere, defendant, Robert Frank Stewart, Sr., also known as Frank R. Odom, did knowingly and intentionally travel across a state line, namely the Texas state line, having previously been located in the State of Alabama, and did travel across said state line with the intent to harass and injure another person: To wit, [court's misstatement and immediate correction thereof deleted] Richard L. Stewart, and as a result of said travel placed Richard L. Stewart in reasonable fear of the death of or serious bodily injury to Richard L. Stewart and the immediate family of Richard L. Stewart, in violation of Title 18, United States Code, Section 2261A.

[The Court instructed the jury similarly with respect to Counts 2-4 of the indictment charging Stewart with violations of § 2261A with respect to Robert Frank Stewart, Jr., Doris Stewart, and Raymond Stewart.]

[]Section 2261A makes it a crime for anyone to travel across a state line with the intent to injure or harass another person and as a result of such travel place that person in reasonable fear of death of or serious bodily injury to that person or a member of that person's immediate family.

For you to find the defendant guilty of the crime as charged in Counts 1 through 4 of the indictment, you must be convinced that the government has proved each of the following beyond a reasonable doubt: First, that the defendant crossed a state line within the United States with the intent to injure or harass another person. And the named victim there means that the person named in each one of those counts.

And, second, that as a result of such travel, that person, the named victim, was placed in reasonable fear of the death of or serious bodily injury to that person or a member of that person's immediate family.

* * *

The word, knowingly, as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident.

During their deliberations, the jurors sent the trial court a note: "Please provide a legal definition of harassment or a dictionary." The trial court sent them an additional written

29

instruction: "The term, harassment, means a course of conduct directed at a specific person that causes substantial emotional distress in such person and serves no legitimate purpose."[9]

Under the construction of the statute set forth above, a trial court is obliged to instruct the jury that a conviction under 18 U.S.C. § 2261A requires proof that (1) the offender crossed a state line knowing that he would injure or harass a particular victim in the state of his destination; in this connection, "harass" means to knowingly place another person in reasonable fear of death or serious bodily injury to himself or to a member of his immediate family; (2) the offender engaged in conduct that he knew would place, and that actually placed, the victim in reasonable fear of death or serious bodily injury to himself or to a member of his immediate family; and (3) the victim's reasonable fear of death or serious bodily injury occurred in the course of or as a result of the offender's interstate travel. Consequently, the jury instructions given in the case at bar were erroneous in two respects. First, the instructions incorrectly used and defined "harass" in describing the first material element of § 2261A; and, second, the jury charge on the state of mind that the offender must have to be guilty of "placing" a victim in reasonable fear of death or serious bodily injury was not clear or correct.

Prior to the present case, these requirements of § 2261A had not been explicitly defined by law or judicial interpretation.

_____

[9]This instruction was based on 18 U.S.C. § 1514(c), which defines "harassment" for purposes of a civil action to restrain harassment of a victim or witness in a federal criminal case.

Under *Griffith v. Kentucky*, 479 U.S. 314 (1987), a "new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases...pending on direct review...with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Id.* at 328. Because Stewart is still on direct review, *Griffith* requires that, if the statutory construction I have outlined above were adopted by this court, it would have to be applied herein retroactively. Accordingly, under the statutory construction that should be adopted and applied, I conclude there was "error," and the first prong of *Olano* is satisfied. *See Johnson*, 520 U.S. at 462.

With respect to the second prong, *Olano* explained that the word "plain" is "synonymous with 'clear' or, equivalently, 'obvious.'" *See Olano,* 507 U.S. at 734. As to when the error must be plain, *Olano* concluded that "[a]t a minimum, a court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law." *Id. Johnson* rejected the Government's contention that, "for an error to be 'plain,' it must have been so both at the time of trial and at the time of appellate consideration[,]" because "such a rule would result in counsel's inevitably making a long and virtually useless laundry list of objections to rulings that were plainly supported by existing precedent." *Johnson*, 520 U.S. at 467-68. Accordingly, the Court in *Johnson* held "that in a case such as this--where the law at the time of trial was settled and clearly contrary to the law at the time of appeal-it is enough that an error be 'plain' at the time of

31

appellate consideration." *Id.* at 468. Prior to *Johnson*, this court had already adopted a similar rule that permits defendants to assert plain error based on intervening changes in the law. *See United States v. Jobe*, 101 F.3d 1046, 1062 (5th Cir. 1996)("Allowing plain error review when an objection would have been baseless under then-current law does not countenance the sandbagging that the contemporaneous objection rule is designed to prevent, while denying plain error review in that situation would encourage frivolous objections by defense attorneys trying to preserve error based on every conceivable future change in the law.")(citing *United States v. David*, 83 F.3d 638, 645 (4th Cir. 1996)).

In the present case, the trial court sent the jury at its request a written definition of "harassment" taken from 18 U.S.C. § 1514(c)(1). Section 2261A does not explicitly define the term "harass" with respect to the first material element of the offense. At the time of trial, there were no judicial decisions interpreting "harass" for purposes of § 2261A. Thus, if the court were to adopt the statutory construction, not until its decision interpreting § 2261A by adding clarification of the term "harass" would the error committed by the district court in defining "harassment" become clear and obvious, i.e., "plain." Consequently, the decision to this effect defining "harass" in § 2261A would represent an unforeseen change of the law that was apparently existing at the time of trial just as much as occurs when a well-settled jurisprudential rule is overturned. In the present case, allowing plain error review of this error would not undermine the

contemporaneous objection rule, but denying it would "encourage frivolous objections by defense attorneys trying to preserve error on every conceivable change in law." *Jobe*, 101 F.3d at 1062. Moreover, for Stewart to have the benefit of plain error review is consistent with the requirement of *Griffith* that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases pending on direct review and not yet final. *See also United States v. Retos*, 25 F.3d 1220, 1230 (3d Cir. 1994)(plain error review allowed where jury instruction error became clear only with the Supreme Court's intervening decision in *Ratzlaf v. United States*, 510 U.S. 135 (1994), holding that to establish that the defendant "willfully violated" the anti-structuring law, the government must prove that the defendant acted with knowledge that his conduct was unlawful). Therefore, for purposes of my review, the second part of the *Olano* test is satisfied regarding the erroneous jury instruction defining "harass."

However, the error in the instructions regarding the proof of the mental state required to establish the material element of placing a victim in reasonable fear of death or serious bodily injury is not "plain." The jury instructions touched on this culpability requirement in several different ways. First, the jury was told that each count of the indictment charged that Stewart "did knowingly and intentionally travel across a state line, namely the Texas state line, and did travel across said state line with the intent to harass and injure another person: to wit [name of the particular alleged victim] and as a result of such travel placed

33

[that victim] in reasonable fear of death or serious bodily injury [to that victim or the victim's immediate family.]" Second, the jury was instructed that "Section 2261A makes it a crime to travel across a state line with the intent to injure or harass another person and as a result of such travel place that person in reasonable fear of the death of or serious bodily injury to that person or a member of theat person's immediate family." Third, the trial court instructed the jury that to find the defendant guilty "you must be convinced that the government has proved each of the following beyond a reasonable doubt: first, that the defendant crossed a state line...with the intent to injure or harass another person....And, second, that as a result of such travel, that person, the named victim, was placed in reasonable fear of the death or serious bodily injury to that person or a member of that person's immediate family." Fourth, the jury was charged that "[y]ou may also consider reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted." Finally, the trial court instructed that "[t]he word, knowingly, as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident."

These state of mind instructions, considered as a whole, were ambiguous. They reasonably may have been understood to convey the message that Stewart had to have knowingly caused a particular victim to be placed in reasonable fear of death or serious bodily

34

injury in order for the jury to find him guilty on a particular count.  On the other hand, the jury charge may have indicated to a reasonable juror that the government must prove only that Stewart crossed the state line with the intent to injure or harass the victim and that Stewart's interstate travel resulted, knowingly or unknowingly, in the victim's reasonable fear of the prescribed consequences.  Perhaps a reasonable juror would be less likely to make the latter interpretation because it would permit an accused who had guilty thoughts concerning a particular person while crossing the state line to be convicted even if that person's reasonable fear was caused unknowingly or unintentionally by the accused's travel or because of mistake or accident.  Consequently, the jury charge's error in failing to give a clear instruction as to the culpability or state of mind requirement with respect to placing a victim in fear is not "obvious," "clear," or "plain," and may not be noticed or corrected under Rule 52(b).

The third requirement for plain error review under Rule 52(b) is that the plain error affect substantial rights.  This is the same language used in Rule 52(a), the harmless error rule providing that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Rule 52(b) normally requires the same kind of harmless error inquiry, but "with one important difference: It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Olano,* 507 U.S. at 734-35.

An improper instruction on an element of the offense violates

the Sixth Amendment's jury trial guarantee.  *See Neder v. United States*, 119 S.Ct. 1827, 1835 (1999); *Rose v. Clark,* 478 U.S. 570, 580, n.8 (1986); *Francis v. Franklin,* 471 U.S. 307, 313 (1985); *Jackson v. Virginia*, 443 U.S. 307, 320, n.14 (1979); *Cool v. United States,* 409 U.S. 100, 102-03 (1972); *In re Winship,* 397 U.S. 358, 363 (1970); *Screws v. United States,* 325 U.S. 91, 107 (1945) (plurality opinion).  The test for determining whether such a constitutional error is harmless is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder,* 119 S.Ct. at 1837 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967) and *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)("[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.")).

The defendant Stewart has sustained his burden of persuading me that I cannot confidently say, on the whole record, that the constitutional error in the jury charge and the additional written instruction using an improper definition of the terms "harass" or "harassment" constituted harmless beyond a reasonable doubt.  The trial court's jury instructions failed to correctly inform the jury that the government was obliged to prove that Stewart had crossed a state line with the intention of either injuring each alleged victim or placing each victim in reasonable fear of death or serious bodily injury to himself or his family.  The jury charge repeatedly stated that, with respect to the first element of the offense, the

36

government was required to show only that Stewart had traveled across a state line with the intent to "injure or harass" the named victim. The jury instructions thus conveyed the message that the prosecution could satisfy its burden under the first material element by persuading the jury that Stewart crossed the state line with the intent merely to cause substantial emotional distress to each alleged victim for no legitimate purpose. Consequently, the prosecution was able to represent to the jury that: "It's whether you believe the combination of actions here revealed that the defendant came down with the intent to either injure or harass the victims. And of course because he traveled down here, that they were placed in reasonable fear of serious bodily injury or death."

As the result of the improper instructions and the prosecution's arguments tailored closely to them, there is a reasonable possibility that the jury was led to believe that "harass" meant merely to cause substantial emotional distress to a person for no good reason; and that Stewart could be found guilty as charged if the jury was convinced of only two facts: (1) that Stewart crossed a state line with the intent to cause substantial emotional distress to Doris and his adult sons; and (2) that Stewart's travel to Georgetown, Texas resulted in placing them in the requisite reasonable fear of death or serious harm. Consequently, there is a reasonable possibility that the jury believed that Stewart could be found guilty without the necessity of their being convinced beyond a reasonable doubt that Stewart

37

crossed the state line with the knowledge or intent that he would engage in conduct in Texas that would place each victim in the requisite reasonable fear of death or serious harm.  In other words, the jury was possibly led to believe that the ambit of conduct criminalized by the Interstate Stalking Act was very much broader than that which was actually intended by Congress.  Therefore, I cannot confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.  Thus, *Olano's* third requirement has in my opinion been met.

When the first three parts of *Olano* are satisfied, an appellate court must then determine whether the plain, harmful errors "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings" before it may exercise its discretion to correct the errors.  *Johnson*, 520 U.S. at 469; *see also Olano*, 507 U.S. at 736 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).  Based on the evidence in this particular case including a long history of terroristic conduct by the defendant toward the victims and other persons in the victims' presence, and his death threats that he must have known would be communicated to the victims shortly before his trip, that question  would be answered in the negative by this court.

"[W]hether an appellate court should take notice of an error not raised below must be made on the facts of the particular case, and there are no 'hard and fast classifications in either the application of the principle or the use of a descriptive title.'" 3A CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 856, at 337 (2d ed.

38

1982) [hereinafter WRIGHT] (quoting *Dupoint v. United States*, 388 F.2d 39, 45 (5th Cir. 1967))(citing, inter alia, *United States v. Gerald*, 624 F.2d 1291, 1299 (5th Cir. 1980), *cert. denied*, 450 U.S. 920 (1981)).  This court exercises the power to notice and correct a plain error cautiously and only in exceptional circumstances. *See United States v. Atkinson*, 297 U.S. 157, 160 (1936); *United States v. Adams*, 634 F.2d 830, 836 (5th Cir. 1981); WRIGHT, § 856, at 338. The adversary system presupposes that a party must look to his counsel to protect him and that he must bear the cost of the mistakes of his counsel.  *See* WRIGHT, § 856, at 341 (citing *United States v. Powe*, 591 F.2d 833, 846-47 (D.C. Cir. 1978)). Nevertheless, courts should be more willing to find plain error if it appears that the trial representation by a criminal defendant acting as his own attorney or by a defense counsel, whether appointed or retained, was less than satisfactory.  *See* WRIGHT, § 856, at 341 (citing *Powe*, 591 F.2d at 846-47).  "It is important that justice be done but it is also important that justice seem to be done. 'Even those guilty of the most heinous offenses are entitled to a fair trial.'" *See* WRIGHT, § 856, at 340 (quoting *Screws v. United States*, 325 U.S. 91, 107 (1945) (opinion of Douglas, J.)).

Recently, in *Johnson v. United States*, 520 U.S. 461 (1997), the Supreme Court held that the forfeited error consisting of the trial court's failure to instruct the jury as to the materiality element of the crime of perjury under 18 U.S.C. § 1623 did not seriously affect the fairness, integrity or public reputation of judicial proceedings so as to permit the court to exercise its discretion to

39

correct the error.  *Id.* at 469-70.  The pertinent facts were as follows:

In the late 1980's, a federal investigation into the cocaine and marijuana trafficking of Earl James Fields revealed that he and his partner had amassed some $10 million from their illicit activities.  Following the money trail, federal authorities subpoenaed petitioner Joyce B. Johnson, Fields' long-time girlfriend, to testify before a federal grand jury.  Johnson, who is the mother of a child by Fields, earned about $34,000 a year at the Florida Department of Health and Rehabilitative Services.  She testified before the grand jury that she owned five pieces of real property, including her house. That house was purchased by Johnson in 1991 for $75,600, and in the next two years she added sufficient improvements to it that in 1993 it was appraised at $344,800.   When asked the source of her home improvement funds, Johnson stated that she had put $80,000 to $120,000 into her house, all of which had come from a box of cash given her late mother by one Gerald Talcott in 1985 or 1986.
On the basis of this testimony, Johnson was indicted for perjury under 18 U.S.C. § 1623.   At trial, it was revealed that Fields had negotiated the original purchase of Johnson's home and that Johnson had paid for the property with eight different cashier's checks, including two from a corporation in which Fields had an interest.  It was also established that Gerald Talcott had died in April 1982, several years before the time Johnson claimed he had given her mother the box full of cash.
At the close of Johnson's trial, and in accordance with then-extant Circuit precedent, *see, e.g., United States v. Molinares*, 700 F.2d 647, 653 (C.A.11 1983), the District Judge instructed the jury that the element of materiality was a question for the judge to decide, and that he had determined that her statements were material.
Johnson did not object to this instruction.   Indeed, when the prosecution had presented evidence concerning materiality during the trial, she had then objected, on the ground that materiality was a matter for the judge, and not the jury, to decide. *Id.*, at 61.   The jury returned a verdict of guilty, and Johnson was sentenced to 30 months' imprisonment, three years' supervised release, and a $30,000 fine.
After Johnson was convicted, but before her appeal to the Court of Appeals, we decided *United States v. Gaudin*, supra, which held that the materiality of a false statement must be submitted to the jury rather than decided by the trial judge.   On her appeal, Johnson argued that the trial judge's failure to submit materiality to the jury rendered her conviction invalid

40

under Gaudin.

*Johnson*, 520 U.S. at 463-64.

In *Johnson* the Court observed that the evidence of materiality was "overwhelming," that "materiality was essentially uncontroverted" at trial and on appeal, and that Johnson had "presented no plausible argument that the false statement under oath for which she was convicted -- lying about the source of the tens of thousands of dollars she used to improve her home -- was somehow not material to the grand jury investigation." *Id.* at 470. The Court stated that there was no basis for concluding that the error seriously affected the fairness, integrity or public reputation of judicial proceedings and that no "miscarriage of justice" would result if the error were not noticed. *Id.*

On the record in the present case, I believe that this court would decide that there is no basis for concluding that the error seriously affected the fairness, integrity or public reputation of judicial proceedings. The four victims were members of one immediate family who lived near each other. At least two of the sons were married and had families of their own. Stewart admitted his perpetration of serious physical and mental abuse upon his former wife Doris and their sons in the years prior to 1983. He did not deny many of the threats to kill Doris, to kill his three adult sons and their wives, and to kidnap his son Wesley that the witnesses testified he made shortly before he traveled from Alabama to Georgetown, Texas in March of 1997. The threats he denied, he did so only perfunctorily. He offered no plausible explanation of

41

why his attitude toward the subjects of his threats would have changed before he crossed the Texas state line and arrived in Georgetown. Stewart offered no reasonable explanation for the bizarre incident in which he drove a vehicle across a double yellow line and two opposing traffic lanes to cause a collision with the truck being driven by Richard Stewart. Nor did he explain his peculiar conduct following the accident in avoiding contact with Richard Stewart although he claimed not to have recognized his son until an investigating officer spoke his name over the police radio. It is undisputed that Stewart was seen three times by Richard in the vicinity of the police station when Richard was there, and that one of those times Stewart followed Richard into the building, although Stewart left when he was asked to do so. Stewart did not explain why his actions did not knowingly place Richard Stewart in reasonable fear of death or serious bodily injury to himself or his immediate family; or why his actions did not place the entire tight knit family in such fear for Richard and for each other. Stewart and all of his victims knew that Richard was the legal custodian of Wesley and that Doris had been Wesley's primary caretaker virtually all of his life. As such, as the entire family was aware, Doris and Richard were the main obstacles to Stewart's goal of regaining custody or possession of Wesley and removing him from the vicinity and perhaps from the country. Under the circumstances of this particular case no miscarriage of justice will result from this Court's declining to notice the error in the proceedings with respect to the convictions of the defendant. *See Johnson*, 520 U.S.

42

at 470; *Olano*, 507 U.S. at 736.